# MARYLAND STATE BOARD OF CENSORS *v.* TIMES FILM CORPORATION

[No. 108, October Term, 1956.]

*Decided March 7, 1957.*

456

[redacted]

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Norman P. Ramsey, Deputy Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellant.

*David Ross* and *Felix J. Bilgrey,* with whom were *Ober, Williams, Grimes & Stinson,* and *Bilgrey & Levinson,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

On the ground that their inclusion made the moving picture "Naked Amazon" obscene, the Maryland State Board of Censors ordered deleted from the picture all scenes showing bodies below the waist of the Camayura Indians, who live in the jungles of Brazil, entirely unclothed. On appeal to the Baltimore City Court by the producer, Judge Byrnes reversed the Board, which in turn duly appealed to this Court.

The parts of the Maryland censorship statute here pertinent are found in Code, 1956 Supp., Art. 66A, Sec. 6. Paragraph (a) of that section requires the Board to examine all films to be exhibited in the State and to approve such as are "moral and proper" and to disapprove such as are "obscene, or such as tend, in the judgment of the Board, to debase or corrupt morals or incite to crimes." Paragraph (b) provides: "For the purposes of this article, a motion picture film or view shall be considered to be obscene if, when considered as a whole, its calculated purpose or dominant effect is substantially to arouse sexual desires, and if the probability of this effect is so great as to outweigh whatever other merits the film may possess." Paragraph (c)

provides: "For the purposes of this article, a motion picture film or view shall be considered to be of such a character that its exhibition would tend to debase or corrupt morals if its dominant purpose or effect is erotic or pornographic; or if it portrays acts of sexual immorality, lust or lewdness, or if it expressly or impliedly presents such acts as desirable, acceptable or proper patterns of behavior."

The parties meet head-on in their views as to constitutionality of the statute and as to whether it was rightfully applied by the Board. The Board says that prior restraint of motion pictures is constitutional; the producers that it is not. The Board says that the Maryland statute is tightly drawn and not subject to the infirmities of vagueness and lack of proper standards and, so, is valid; the producers that it is vague and without tests that can constitutionally serve as measurements. The Board urges that it rightly interpreted the statute and properly applied its standards; the producers say that the Board misinterpreted and misapplied the statute and that, in any event, there was no basis in fact for the finding it made. We think that the lower court, in finding the picture not to be obscene or pornographic, came to the right conclusion and, therefore, we do not reach the constitutional questions. We assume, without deciding, that prior restraint of motion pictures is constitutional and that the Maryland statute is aimed at an evil grave, imminent and pervasive enough to justify whatever invasions it makes of rights protected against State action by the First and Fourteenth Amendments, and that it is not so vague that it is without sufficiently definite standards, although such an assumption may be unwarranted, if not legally naive. See *Burstyn v. Wilson,* 343 U. S. 495, 96 L. Ed. 1098; *Butler v. Michigan,* 352 U. S. 380, 1 L. Ed. (2d) 412, 25 Law Week 4165; *Gelling v. Texas,* 343 U. S. 960, 96 L. Ed. 1359; *Commercial Pictures Corp. v. Regents of University,* 346 U. S. 587, 98 L. Ed. 329; *Superior Films v. Dept. of Education of Ohio,* 346 U. S. 587, 98 L. Ed. 329; *Holmby Productions, Inc. v. Vaughn,* 350 U. S. 870, 100 L. Ed. 770; *Brattle Films v. Commissioner of Public Safety* (Mass.), 127 N. E. 2d 891; *Hallmark Productions v. Carroll* (Pa.), 121 A. 2d 584; *Capitol Enterprises*

*v. Regents of the University of the State of New York,* 149
N. Y. S. 2d 920; *Adams Theatre Co. v. Keenan* (N. J.), 96
A. 2d 519. See also the concurring opinion of Judge Frank
in *United States v. Roth,* 237 F. 2d 796, 801, and the opin-
ion of Judge Bok in *Commonwealth v. Gordon,* 66 Pa. Dist.
and County Reports 101. Cf. *Dennis v. United States,* 341
U. S. 494, 95 L. Ed. 1137; the opinion of the majority in
*United States v. Roth, supra;* and *Adams Newark Theatre
Co. v. City of Newark* (N. J.), 126 A. 2d 340.

One Zygmunt Sulistrowski, who is described as an "ex-
plorer and photographer, and a man of adventure", headed
an expedition to the Matto Grosso region of the Brazilian
jungles, financed in part by the American Museum of Nat-
ural History. The expedition took motion pictures in color,
some of which form a part of the picture "Naked Amazon"
which is largely a factual showing of the lives of the natives
of the jungles of Brazil. After scenes depicting pre-lenten
festivities in Rio de Janeiro including dances which the nar-
rator describes as "exotic, voluptuous and sensuous", but
which the Board did not find objectionable, the expedition
group is shown proceeding by boat up the Amazon River.
During this river trip, against a scenic background of the
Brazilian jungle, a few nonfactual or staged scenes appear.
The voyage through the primeval beauty of the jungle—the
camera was focused on wild animals, fish, birds, butterflies,
and sundry flora and fauna—is sought to be made dramatic
by suggesting the struggle of the group against the natural
dangers of the country by scenes such as those of a man
struggling with what is represented to be a dangerous boa
constrictor. When the group makes contact with the Cam-
ayura Indians, the scenes are entirely genuine and docu-
mentary. The Indians are aborigines who are said to bring
to mind pictures of prehistoric man. Their physical structure
and features are ugly and primitive compared with the cur-
rent concept of physical attractiveness. They were described
by one reviewer as particularly "homely and unprepossess-
ing". They are shown in their daily activities with the
narrative discussion pointing out their unusual customs and
rituals. When presented to the Maryland Board for censor-

ship, the film already had been edited, as a prerequisite to approval by both the motion picture industry censorship body and the New York State Censors so that, as Judge Byrnes noted, "* * * intimate parts of the body cannot be seen." None of the scenes portray any action which is even suggestive of sexual activity. The natives are quite unaware that they are without clothing and the narration accompanying the scenes in no manner suggests that they are sexually excited, or exciting, rather, the photography and narration dwell on their unusual customs and rituals, which seemingly give the appearance of rather childlike games.

The Chairman of the Board testified that the deletions were made under the authority of paragraphs (a), (b) and (c) of Section 6 of Art. 66A, Code, 1956 Supplement, specifically and expressly on the ground that the film was "* * * obscene and/or pornographic as defined in said law." He said that it was the considered judgment of the Board "* * * that the showing of nudity, of nude people, in a pseudo-documentary, which this officially is, is calculated to arouse sexual desires of substantial numbers of people." He pointed out that the Maryland law does not provide for banning a film to certain categories or groups of the public. If it is passed, it is available to all who have the desire and opportunity to see it. He said the Board felt that the public would find the film shocking and tending to arouse sexual desires "certainly in irresponsible numbers of people". The Chairman said that the Board's interpretation of the statute was that possible obscenity was not to be weighed with the artistic or other merits of the film as a whole, but rather that particular "views" are to be considered, and the obscenity of those views is to be weighed against the artistic or other merits of the same views. He testified that the Board read the statute as using "pornographic" as substantially synonymous with "obscene", and acted on that reading. Judge Byrnes, who saw the whole film once, and the deleted parts twice, noted that the film as presented to the Board had been prepared so that close-ups of the natives showing their bodies below the waist had been omitted, and found that "* * * the producers were unsuccessful in their

efforts to attribute a pornographic theme to the movie" and therefore it did not come under the ban of the statute. He continued: "The Board was of the opinion that showing of the uncensored film might have an undesirable effect on 'segments of our population'. As this Court does not believe that such reasoning comes within the restrictions contained in Article 66A, it must order the restoration of the eliminated scenes."

We think the Board's basis of decision and its findings were predicated not only on the unsound legal ground remarked on by Judge Byrnes but on another false legal premise. First, the Board acted on the assumption that a scene could be eliminated because its possible obscenity outweighed any of its merits, considering that scene alone. It did not weigh the scenes it found objectionable in relation to the picture as a whole to determine whether overall worth more than counterbalanced possible obscene or pornographic bits or sequences. The Board's interpretation is in the teeth of the words and implications of the statute. Paragraph (b) of Sec. 6 of Art. 66A, Code, 1956 Supp., says that: "* * * a motion picture film or view" shall be considered obscene "if, *when considered as a whole"*, its main purpose and effect is to arouse sexual desires "and if the probability of this effect is so great as to outweigh whatever other merits *the film* may possess." (Emphasis supplied.) The Board defends its position by saying that since the statute refers to a "view", single scenes can be considered alone and not in relation to the picture as a whole. The weakness in the argument is that Sec. 1 of Art. 66A defines the word "view" as used in the article to mean "what is usually known as a stereopticon view or slide" and it is clear to us that the statute means that the picture must be considered in its entirety in determining whether the merits it has outweigh the possibility of obscenity or pornography in a part or parts.

The later cases say that our opinion on this aspect of the case is the currently accepted rule and, also, that Judge Byrnes was right when he said the Board erred in making its determinations to delete depend on the possible effect of the eliminated scenes on but a segment of the population, that

is, on the irresponsible element. In *United States v. Levine,* 83 F. 2d 156, the trial judge charged the jury, who were trying the defendant for posting an obscene circular and advertising obscene books, that the statute was directed against the stimulating of sensuality and that this was not to be measured by the effect of the writings either upon "the highly educated" or upon the "highly prudish" but on the usual average human mind. Judge Learned Hand said for the Court: "This was well enough, so far as it went, but later he in substance took it back. There was a class, he said, 'found in every community, the young and immature, the ignorant and those who are sensually inclined'; the statute was meant to protect these and the jury should regard the effect of the books on their minds, rather than on those of 'people of a high order of intelligence and those who have reached mature years.' If the books contained a 'single passage' such as would 'excite lustful or sensual desires' in the minds of those 'into whose hands they might come,' the statute condemned them." The Court held that the general effect of the whole book and not the general or specialized effect of separate passages must control, and reversed for error in the charge. See also *Walker v. Popenoe,* 149 F. 2d 511, 512, where the Court said: "The effect of a publication on the ordinary reader is what counts" and went on to note: "The statute does not intend that we shall 'reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few.' [quoting *United States v. Kennerley,* 209 F. 119, 121] * * * The statute does not bar from the mails an obscene phrase or an obscene sentence. * * * If a publication as a whole is not stimulating to the senses of the ordinary reader, it is not within the statute." See also *Parmelee v. United States,* 113 F. 2d 729; *Sunshine Book Co. v. Summerfield,* 128 F. Supp. 564, 568; and *United States v. 4200 Copies International Journal,* 134 F. Supp. 490, 493, where the Court said that the bar of the statute applied if the publication, considered as a whole, offended the sense of decency and morality of "* * * the average, normal, reasonable, prudent person of the community * * *." See, too, *People v. Wendling* (N. Y.), 180 N. E. 169. The

community standard of decency, like the standard of ordinary care, must be, in a sense, a rough average. A picture is not to be banned as obscene because of its possible effect, not upon the average citizen but only upon the irresponsible, the immature, or the sensually minded. In *Butler v. Michigan, supra,* the Supreme Court held unconstitutional a law forbidding the sale or distribution of publications containing obscene language or pictures that tended to incite minors to immoral acts or to corrupt them. The Court said: "The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. * * * The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society."

We recognize, as the Board argues, that its findings, like those of any other administrative body, must be upheld by the court on appeal if there is substantial evidence to support them and it has not misinterpreted or misapplied the applicable law. Assuming, as we have, the constitutionality and validity of the law, whether a picture is obscene under the Maryland statute ordinarily would be a question for the Board, and its judgment would not be displaced by that of the court. In the case before us, however, we think the Board did misinterpret and misapply the statute and that there is no reasonable or substantial basis even on its theory of the law, and certainly not under the statute as we read it, for a finding that the calculated purpose and dominant effect of the "Naked Amazon" was "substantially to arouse sexual desires", based as it was only on the showing of primitive unprepossessing aborigines going about their daily lives in their native surroundings, unclothed, as is their custom, with no intimation of sexual activity or awareness. Particularly is this so, where, as is the case here, the pubic areas of the body were either not photographed or were shadowed out so as not to be visi-

ble. It has been held in a number of cases that nudity is not necessarily obscene or lewd. In *Parmelee v. United States*, 113 F. 2d 729, *supra*, Judges Groner and Miller, with Judge Vinson dissenting, held that although an imported book entitled "Nudism in Modern Life" contained three or four photographs of front full views of nude female figures, and two photographs in which nude male and female figures appeared together, the book was not obscene. The Court said: "It cannot be assumed that nudity is obscene per se and under all circumstances. Even the application of the narrowest rule would not justify such an assumption. And, from the teachings of psychology and sociology, we know that the contrary view is held by social scientists. Nudity in art has long been recognized as the reverse of obscene. * * * Even such a conservative source book as Encyclopaedia Britannica contains nudes full front view, male and female, and nude males and females pictured together * * *." In *Sunshine Book Co. v. Summerfield*, 128 F. Supp. 564, *supra*, the District Court for the District of Columbia held that the magazine "Sunshine and Health", a publication of a nudist cult, was obscene and properly withheld from the United States mails because it showed full front views of males and females. The Circuit Court of Appeals reversed. See *Sunshine Book Co. v. Summerfield*, 24 Law Week 2560■ The Court held that whatever the ordinary scope of review of a court in dealing with facts on appeal from administrative bodies, it is broader than it might otherwise be when first amendment considerations are involved, and said: "* * * it is clear that we must intervene if improper standards have been applied in making the determination of obscenity. We think that has occurred here." The Court held that the publication under consideration must so much arouse the salacity of the potential reader as to outweigh any literary, scientific or other merits it may have in his hands, and on that test found the magazine not to be obscene. A similar holding as to the same nudist magazine was made in *State v. Lerner* (Court of Common Pleas, Hamilton County, Ohio), 81 N. E. 2d 282. We do

not have the problem that was present in the *Parmelee, Sunshine* and *Lerner* cases, for here all pictures of the pubic area and genitalia have been eliminated or that area made invisible. It is commonly held, that where this is so, pictures of the nude human form are not obscene. In the District Court decision in the *Sunshine* case, Judge Kirkland held not to be obscene pictures that show the human form in the nude without revealing the pubic area, or that show only posterior or side views, whether male or female, young or old. In *Commonwealth v. Huester,* Pa. Ct. Q. Sess. Mercer Co. Pa., 25 Law Week 2194, the court said that this rather practical rule of thumb coincided with the somewhat more subjectively stated rule of Pennsylvania that an obscene thing is that which is sexually impure, pornographic or dirt for dirt's sake.

In *American Museum of Natural History v. Keenan,* Superior Ct. of N. J., Chanc. Div., 89 A. 2d 98, a bill was filed to restrain the Director of Public Safety of the City of Newark from interfering with the exhibition of a color film that was an authentic photographic record of the life, customs and ceremonies of the Latuko tribe, depicting in documentary form the actual day by day living of the tribe. The Chancellor said: "From my viewing of the film, the proofs and argument, I wholeheartedly agree with the plaintiffs' contention that 'there is nothing suggestive, obscene, indecent, malicious or immoral in the showing of the Latuko aborigines in their normal living state.' While it is true that the men have been photographed naked and the women naked above the waist, the exposure of their bodies is not indecent; it is simply their normal way of living. They are not shown in any attitude or function to which exception might justifiably be taken. In my opinion, only a narrow or unhealthy mind could find any depravity in the film." The case was cited by the Supreme Court of New Jersey in *Adams Theatre Co. v. Keenan,* 96 A. 2d 519, 521, *supra* (Mr. Justice Brennan speaking for the Court), as correctly stating the law.

We think Judge Byrnes did not err in holding that the scenes ordered to be deleted would not, if shown as part of the picture "Naked Amazon", cause the picture to amount to an erotic allurement or to a calculatedly effective incite-

ment to sexual desires. We agree, as his opinion necessarily implies, that the picture cannot be said to suggest, except to a prurient imagination, unchaste or lustful ideas and that it is neither obscene nor pornographic.

We find no substance in the Board's contention that Judge Byrnes reached the wrong result because he considered the Board's ruling to have been that the film was pornographic, whereas, in fact, the Board held it to be obscene. Apart from the fact that the Board's order was expressly based on a finding that the film was obscene or pornographic, or both, the testimony of the Chairman makes it plain that the Censors found no distinction between the two in the statute and, in acting, regarded them as one.

*Order affirmed, with costs.*