## TRANS-LUX DISTRIBUTING CORPORATION v. MARYLAND STATE BOARD OF CENSORS

[No. 143, September Term, 1965 (Adv.)].

*Decided, per curiam, June 29, 1965.*

*Opinions filed September 27, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY, SYBERT, OPPENHEIMER and BARNES, JJ.

*J. Cookman Boyd, Jr.,* and *Adolph Kaufman,* with whom were *Walter S. Levin, Leonard H. Dickstein* and *Weisman, Cellar, Allan, Spett & Sheinberg* on the brief, for appellant.

*Fred Oken, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Roger D. Redden, Assistant Attorney General,* on the brief, for appellee.

BARNES, J., delivered the majority opinion of the Court. HORNEY and SYBERT, JJ., dissent. Dissenting opinion by HORNEY, J., at page 115, *infra.*

After the Supreme Court of the United States invalidated Maryland's statute [1] requiring licensing by the Maryland State Board of Censors (the Board) of motion pictures prior to their exhibition, by its decision in *Freedman v. Maryland,* 380 U. S. 51, 85 S. Ct. 734, 13 L. Ed. 2d 649 (decided March 1, 1965),[2] the General Assembly of Maryland enacted Chapter 598 of the Acts of 1965 (Act of 1965) as an emergency measure which

---

1. Code, Article 66A, Sections 1 to 26.
2. This case reversed our decision in Freedman v. State, 233 Md. 498, 197 A. 2d 232 (1964).

became effective upon its signature by Governor Tawes on April 8, 1965. The Board, on April 19, 1965 was presented by the appellant, Trans-Lux Distributing Corporation, with the motion picture "A Stranger Knocks" (the film) in order to obtain a license. The Board reviewed the film on April 22, 1965, disapproved it under Section 6 of Article 66A and made the following finding:

> "After reviewing the entire film and considering it as a whole, the Board finds that the film goes substantially beyond customary limits of candor in description and representation of sex, that it deals purposely and effectively with sex in a manner which appeals to the prurient interest, that it is without social importance, and that it lacks any identifiable artistic, cultural, thematic or other value which might be considered redemptive."

Also on April 22, the Board, pursuant to the Act of 1965, filed a petition in the Circuit Court of Baltimore City (Circuit Court) for an order affirming the Board's finding and its disapproval of the film for licensing. Judge Prendergast viewed the film on April 27, 1965, took testimony, heard arguments and rendered an informative oral opinion on April 28 indicating that he found the Board's finding to be correct. An order effectuating this opinion was duly signed on April 30 and an appeal taken to this Court on May 10.

We advanced the case for hearing and on June 29, 1965 viewed the film in the morning of that day, heard arguments of counsel and after conference later the same afternoon, filed a *per curiam* order by a majority of the Court, reversing the Circuit Court and directing that the mandate issue forthwith. This opinion gives our reasons for our action in reversing the Circuit Court.

Three principal issues are presented to us for decision:

1. With the addition of the Act of 1965, is the Maryland statutory requirement for pre-showing censorship of motion pictures constitutional on its face?

2. Is the film obscene under the definition of obscenity established by the Supreme Court of the United States?

3. Apart from the federal constitutional question and assuming, arguendo, that the standards set forth in Section 6 of Article 66A are not too vague and uncertain to be enforced constitutionally, does the film transgress the Maryland standards?

## I.

We agree with the Circuit Court that the present Maryland statutory plan for pre-showing motion picture censorship is constitutional on its face. Prior to its decision in *Freedman,* the Supreme Court had indicated in *Times Film. Corp. v. City of Chicago,* 365 U. S. 43, 81 S. Ct. 391, 5 L. Ed. 2d 403 (1961) that a statutory requirement of submission of motion pictures in advance of exhibition was not necessarily unconstitutional *under all circumstances.*[3] The Supreme Court in the *Freedman* case held that the Maryland statute prior to the enactment of the Act of 1965 was unconstitutional as a violation of the First Amendment to the Constitution of the United States as made applicable to the States by the provisions of the Fourteenth Amendment as construed by the Supreme Court because:

1) If the Board disapproved the film, the exhibitor was required to assume the burden of instituting judicial proceedings and of persuading the court that the film was constitutionally protected expression; 2) after the Board had declined to license the film, its exhibition was prohibited pending judicial review, however long such judicial review might take; and, 3) the Maryland statute provided no assurance of prompt judicial determination.

By the Act of 1965, the General Assembly repealed and reenacted Section 19 of Article 66A of the Code with the obvious intention of fully meeting the three objections set forth in the *Freedman* opinion. We think the Legislature succeeded in accomplishing this result. The new Section 19 provides that *any* film duly submitted to the Board for examination and licensing "shall be reviewed and approved within five (5) days, unless the Board shall disapprove" the film under the provisions of Section 6. In the event of disapproval, the Board is required

---

3. Black and Douglas, JJ. were, and for some time have been, of the opinion that all such statutes are unconstitutional under all circumstances.

"within not later than three (3) days thereafter, to apply to the Circuit Court for Baltimore City for a judicial determination as to whether such film is obscene, or tends to debase or corrupt morals, or incite to crimes, within the meaning of Section 6 . . ." It is also required that "notice of such application shall be forthwith sent by first class mail, postage prepaid, to the address of the person presenting such film for licensing." The Circuit Court is required within five days after the filing of the application to conduct a hearing, view the film and within two days after the hearing, "enter its decree and order requiring that said film be approved and licensed or be disapproved if in violation of the provisions of said Section 6 hereof." It is further provided that if the order disapproves the film, then the person presenting the film for licensing may appeal such determination to the Court of Appeals in accordance with the Maryland Rules of Procedure,[4] and the Court of Appeals "shall advance such case upon its hearing calendar to the earliest practicable date" and in its review, the Court of Appeals "shall view the subject film." Then is added, "The burden of proving that the film should not be approved and licensed shall rest on the Board."

We have already indicated that full procedural compliance with the Act of 1965 was had in the Circuit Court and in this Court.

The General Assembly used, in part, as a model the New York injunctive procedure involved in *Kingsley Books, Inc. v. Brown*, 354 U. S. 436, 77 S. Ct. 1325, 1 L. Ed. 2d 1469 (1957) as suggested in Mr. Justice Brennan's opinion in *Freedman* (see p. 740 of 85 S. Ct.). In our opinion, the Act of 1965 carries out the requirement in *Freedman*—

> "* * * [T]hat the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited

---

4. The appeal may be entered at any time after the order is filed but not later than 30 days therefrom.

to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution."

The General Assembly also provided, as already set forth, that the burden of proving that the film should not be approved and licensed shall rest on the Board so that the Board, notwithstanding its character as an administrative body, must establish its disapproval by the weight of the credible evidence before the Circuit Court. This is a statutory change of the rule we indicated was applicable to findings of the Board in *Board of Censors v. Times Film,* 212 Md. 454, 462, 129 A. 2d 833, 838 (1957).

## II.

We now consider whether the film is obscene within the meaning of the decisions of the Supreme Court of the United States.

The case of *Roth v. United States* (and *Alberts v. California*), 354 U. S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 498 (1957), and the subsequent *per curiam* opinions of the Supreme Court applying the *Roth-Alberts* Rule [5] in a summary manner, as well as relevant prior federal and state cases, have been so thoroughly and carefully analyzed and considered in the majority and dissenting opinions in the case of *Monfred v. State,* 226 Md. 312, 173 A. 2d 173 (1961), that we think it would serve no useful purpose to have further extended discussion of those cases. See also the interesting and helpful discussion of the constitutional and other issues involved in this litigation in a book entitled "Censorship" by Morris L. Ernst and Alan U. Schwartz, especially Part IV, "Obscenity and the Constitution," pages 199-225. Our task is to ascertain what, if any, additions or limitations have been declared by the Supreme Court in regard to that rule by *Jacobellis v. Ohio,* 378 U. S. 184, 84 S. Ct. 1676, 12 L. Ed. 2d 793, opinions filed June 22, 1964.

In *Jacobellis* there was a division of opinion in regard to

---

5. The *Roth-Alberts* test of obscenity as enunciated by Mr. Justice Brennan, for the majority of the Supreme Court is: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest."

whether the "community" involved is local or national, three justices indicating that it should be the local community, two justices indicating that it should be the national community and four justices remaining silent on this issue. Fortunately in the case at bar, we need not resolve this thorny issue as under either theory of applicable "community," the film in this case is, in our opinion, not obscene. We, therefore, do not pass upon this particular issue, preferring to wait for further clarification of the issue by the Supreme Court itself.

Mr. Justice Brennan in his opinion in *Jacobellis* amplified and clarified the *Roth-Alberts* definition as follows:

1. Although motion pictures are within the constitutional guarantee of freedom of expression, obscenity is excluded from constitutional protection, but only when it is "utterly without redeeming social importance" and a work "cannot be proscribed unless it is 'utterly' without social importance.

2. "[T]he 'portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional freedom of speech and press,'" and "material dealing with sex in a manner which advocates ideas * * * or that has literary or scientific or artistic value or any other form of social importance, may not be branded as obscenity and denied constitutional protection."

3. In the first instance, there must be a finding "that the material 'goes substantially beyond customary limits of candor' in description or representation of such matters" and "in the absence of such deviation from society's standards of decency, we do not see how any official inquiry into the alleged prurient appeal can be squared with the guarantees of the First and Fourteenth Amendments."

4. The community standard involved is a national and not a local standard.

We have concluded that the *Roth-Alberts* test as amplified and clarified by Mr. Justice Brennan is applicable in the case at bar, except, as we have noted, we do not find it necessary to determine whether the applicable community standard is national or local.

We turn to the facts. The film was produced in Denmark in 1959 and was directed by the distinguished producer and di-

rector, Johan Jacobsen. It runs for 81 minutes, and is a Danish language picture with English subtitles. The characters are a man, played by Preben Lerdorff Rye and a woman played by Birgitte Federspiel. There is a brief appearance of an insurance collector played by Victor Montell.

At the beginning of the film appears the language from Holy Scripture, Gen. 4:15, "And the Lord set a mark upon Cain, lest any finding him should kill him." The first scene in the film shows a burly male figure, clad in a raincoat, walking along a lonely road. The day is dark and there is intermittent rain. The appearance and actions of the man suggest that he is a fugitive. He comes upon a cottage near the sea shore, and looks it over carefully before he knocks at the door. A comely young woman answers the door and he explains that he is on vacation, has lost his way, and is looking for a place to stay. She invites him in to dry his clothing and to stay for lunch. While she is in the kitchen preparing lunch, he looks around the room carefully and notes that a radio is in the room. While having lunch, he plies his hostess with questions about herself and her background. He learns that she is alone. To his surprise, she invites him to spend the night. He accepts. She motions him to a place by the fire in the living room, retires to her bedroom and locks the bedroom door. After a while, he roams the room, and learns her name from a paper he finds. The night is passed without incident.

The following morning they breakfast together. He inquires about visitors, bus transportation and the bus schedule. Later he walks into the yard and, after seeing her bicycle, takes out his pocket knife and slashes the rear tire. She comes out from the house and they engage in conversation. She tells him she has lived at the cottage for three years since the Second World War. She learns he is not married and is pleased to learn this.

He then bids her farewell and leaves. She watches as he walks away. Later, in the cottage, she turns on the radio. His description is being broadcast, but she appears not to hear it. Later in the day, he returns to the cottage (having in the meantime rested in a thicket not far from the cottage to allow for the passage of time) and she smiles a welcome. He explains that

he missed the bus. Later he caresses her as he adjusts a scarf around her neck. She says "You mustn't," but he ignores this mild rebuke and caresses her again. She walks away as he follows at a distance. She goes to a bench on a hill overlooking the sea and voices a soliloquy about her dead husband whose memory continues to haunt her. She recalls that he died under torture calling her name and that he had requested her to bury her wedding ring after his death and look for a new life.

In the following scene, it is evening and they talk by the open fire. He recounts further reminiscences of his past. He learns that her husband is dead; that they were happy in this cottage. After she leaves the room, he asks himself, "Who is she—I must find out." After searching the room he finds an automatic pistol in a desk drawer, and puts it in his pocket. As this scene ends he says to himself, "I must find out all about her—I want her."

The following morning they appear in swimming garb and walk hand in hand to the beach in front of the cottage. Her bathing suit is a one-piece one, entirely conventional. She has on a beach robe made of toweling material. After the swim, the woman is shown wrapped in the beach robe and carrying her wet bathing suit as the dripping water falls from it. The man is lying on the sand and the woman walks over to him and lies down beside him. They kiss and he fondles her. The scene clearly implies that they are having sexual intercourse, but there is no showing of nude figures. For the most part only the necks and shoulders of the parties are shown. She indicates satisfaction as the scene concludes.

Thereafter she buries her wedding ring in the sand and tells him "All is well." They playfully romp around the yard and she accidentally knocks over a pile of wood which he had previously carefully piled up. He utters some angry words. She speaks to him in a soothing voice, after which they kiss.

The next scene is at night with the man and woman in bed side by side. He fondles her and inquires again about her husband. She replies: "We came here to get away from it all. We had a wonderful time. Then some friends came here. They belonged to the underground. He also joined the Resistance. He came and went frequently. Then one day he came no more. He

was caught." The man says, "Life is to kill or be killed. We have no choice." She replies, "Paul loved me. He screamed my name as they tortured him. The man who tortured him had a scar on his arm in the shape of an unusual bite." Surreptitiously the man rolls down his sleeve to conceal his upper arm.

The following morning it was raining. She is dressed to go out and says she is going to the grocer's. He tells her not to go, and after an argument, knocks her down. He is instantly sorry. There is a knock at the door and the man hides in the bedroom. The person at the door is an insurance agent who has come to collect the premium on her fire insurance policy. The man in the bedroom with the door slightly ajar, has the pistol in his hand ready for use if the caller is looking for him. She goes to her desk to write a check to pay the premium and finds the pistol gone. The insurance agent leaves and the man emerges from her bedroom. He explains that he hid for her sake to avoid gossip. She is now alarmed, and continues to search for the pistol.

The next scene shows them on the couch in the living room, fully dressed, in each other's arms. She asks him about the pistol but he gives no clear answer. She rises to pour some wine from a small decanter and each drinks some of the wine. He lies down on the couch. The next scene shows her astride him and again the movements of the parties imply that sexual intercourse is being performed. They are both fully clothed. She kisses him and says "I love you." As she reaches a climax the bite-shaped scar on the man's arm is revealed. She realizes that he is her husband's murderer, and falls back in anguish. She falls backward and lies over the man. He is still on his back.

She then arises, recovers the pistol from his jacket pocket and goes into the kitchen and asks herself what she should do. "He must confess," she says. He calls to her and they talk. She offers to go away with him and says "I must know you completely." He notices that she acts strangely and then goes to his jacket, finding the pistol gone.

In the final scene, she points the pistol at him and asks "Why"? He scorns her and demands that she give him the pistol. She aims it at him and says "Talk about Paul." He re-

minds her that they love each other. She says "You used me. You are loathsome," and again demands "Tell me about Paul." She is horrified as he admits that he was a collaborator with the Nazi SS during the war and that they tortured and killed her husband. "We shot him in the neck." She lowers the pistol. He does not seek to take it from her but throws a glass of wine in her face and runs to the door. As he is about to run out the door, she shoots him in the back. As he dies he says, "One animal kills another." With the pistol still in her hand she goes out the door and walking slowly down the path casts the pistol to one side as the film ends.

In addition to the film, produced by the Board in the lower court, the following evidence was produced by Trans-Lux: The United States Bureau of Customs under the Tariff Act of 1930 admitted the film for entry into the United States after the Bureau had determined that the film was not obscene. Early in 1963, the film was exhibited in over 150 theatres in 23 States and the District of Columbia. It has been viewed by not less than 250,000 persons without any untoward incidents. When first exhibited in Denmark, the film was awarded three "Bodils" (equivalent to an "Oscar" in the United States) as 1) the best Danish picture for the year 1959, 2) for the best female performance for that year, and 3) for the best male performance for the year. In January 1964, the International Film Importers and Distributors of America awarded Birgitte Federspiel, the female lead in the film, its award for the best performance of the year by a female actress in an imported foreign picture. The film was licensed by the appropriate authorities for exhibition in Chicago and has been exhibited in that City.

The director and producer of the film, Johan Jacobsen, in his affidavit admitted into evidence, stated that he has been a director and producer of films for 26 years, has produced 34 films and directed 25 films and twice has received all three awards from the Danish Film Critics—one in "The Soldier and Jenny," and again in "A Stranger Knocks," the film involved in this case. The film opened in Copenhagen and ran for 15 weeks. He explained that his primary interest was in the maintenance of the high standard for which Danish films are noted, rather than profits, *per se,* and "I have never been in a position where-

in I had to descend to the level of exploiting sexual activity on the screen for the sole motive of sensationalism. My reputation stands as testimony of this statement." He further stated: "I was frankly shocked to learn that the censors concluded that this film which I intended as a serious treatment of a question of vital contemporary importance was nothing more than an exercise in 'obscenity.' Let me make it very plain that it was not intended, nor was any part of it intended to appeal to the sensation seeker or to the prurient interest."

Mr. Jacobsen gives in some detail the philosophical basis for the film and how the two scenes, to which objection has been raised, were of crucial significance in the film as a work of art and as a serious film. The first scene shows the complete commitment of two antithetical characters—the woman having the idealistic, the man the cynical and pragmatic character — in achieving a harmony and in the awakening of life and hope. The second scene shows the supreme effort of the woman to break down the barrier which suspicion has created and represents a desperate effort by the woman, threatened again with isolation, to communicate. By her actions she assumes the position of dominance and of total commitment to the man as well as the protectiveness of the female. The man, detached and triumphant and yet moved to tenderness, is insulated by this all-embracing love from the brutality and corruption of the world with which he could not cope. At the moment of sexual fulfillment, the discovery is made that the man is her husband's murderer. The groan of pleasure and of pain is the dramatic expression of the essential ambivalence in the relationship.

Favorable criticisms from the following motion picture critics, were introduced into evidence:

George Browning who has written reviews for the Baltimore News Post, News American, the United Press, the New York World Telegram, the Box Office, Motion Picture Daily and the Film Daily.

Bosley Crowther, leading motion picture critic for the New York Times.

Alton Cook, reviewer for the New York World Telegram and Sun.

Marion Simon, reviewer for The National Observer.

Margo Miller, reviewer for The Boston Globe.

Kathleen Carroll, reviewer for the New York Daily News.

Frederick H. Guidry, reviewer for The Christian Science Monitor.

Elinor Hughes, reviewer for The Boston-Herald.

Henry T. Murdock, reviewer for The Philadelphia Inquirer.

Hollins Alpert, reviewer for The Saturday Review of Literature and who has written motion picture articles for the New York Times Magazine, Theatre Arts, Esquire, Charm, Partisan Review and other magazines.

In addition to these critics, Trans-Lux introduced an affidavit of Arthur Mayer, head of the Paramount Publishing and Advertising Department for 40 years and an operator of hundreds of theatres during that period, who is a frequent contributor to The Saturday Review and Variety and who has lectured at a number of prominent universities and schools. In this affidavit, Mr. Mayer gave his opinion that the film "is a serious work which is written, directed and acted with professional competence" and that the appeal of the film—and of the two scenes complained of—is not to the prurient interest. He further stated: "While the film undoubtedly explores a close intimacy between a man and a woman in sexual terms, I do not believe that the subject is handled in such a fashion as to offend any reasonable and mature man or woman. In short, it is my opinion that this film, rather than appealing to the prurient interest, is a work of professional competence which explores a moral problem of genuine contemporary significance."

A portion of Marion Simon's review may be quoted to illustrate the critical opinion. It stated, in part:

> "There's nothing lewd about this stark two-character drama of love, hatred, and revenge in postwar Denmark. * * *."

> "Birgitte Federspiel — gracefully long-limbed, with a face like Claudette Colbert's — remains discreetly clothed throughout, except for one beach scene where the black-and-white camera is glued to her face. Preben Lerdorff Rye is almost Victorian as the hunted former Nazi collaborator who comes knocking at Miss

Federspiel's isolated cottage, where she has lived for three years in bitter tribute to a husband murdered for his war activities in the Danish underground.

"Here they play out their *parable of Cain's exile* under Mr. Jacobsen's taut, realistic direction, deftly probing the questions of good and evil, spite and respite that Finn Metherling has woven into his screenplay. And the two debated scences [scenes] are so much a part of the relationship between these two people—man and woman, killer and victim, judged and judging—that the film couldn't have been made without them."

The Board offered no evidence before the lower court of *any* expert or other opinion indicating that the film appealed to the prurient interest or was not a serious work of art. It only offered in evidence the film itself, contending that the two scenes complained of in the film met the burden of proof imposed upon it by the Act of 1965. We do not agree. In our opinion the weight of the testimony—including the film itself—establishes that the film is a serious work of art, dealing with a subject of social importance and does not appeal to the prurient interest. It most certainly is not "utterly without redeeming social importance," the film "deals with sex in a manner which advocates ideas having artistic value and social importance," and "does not go beyond the customary limits of candor in the description of such matters." The film may not constitutionally be denied a license for exhibition by the Board under the Roth-Alberts Rule as amplified and explained by Mr. Justice Brennan in *Jacobellis*.[6]

---

6. The film had a curious legal history in New York. In that State the Board of Regents of the University of New York (corresponding to the Maryland Board for pre-showing censorship of motion pictures) declined to license the film. Its action was reversed by the Supreme Court, Appellate Division, Third Department by a 4 to 1 decision Presiding Judge Bergan being with the majority and Judge Herlighy writing a dissenting opinion. See Trans-Lux Distributing Corp. v. Board of Regents, 244 N.Y.S. 2d 333. Thereafter on appeal to the Court of Appeals of New York (certiorari having been granted), Judge Bergan who, in the mean-

There is no "thematic obscenity" involved in the film, as was urged (unsuccessfully before the Supreme Court) in regard to "Lady Chatterley's Lover" [7]—approval of adultery—and "The Miracle" [8]—alleged approval of blasphemy.

In the case at bar, the film begins with a quotation from Holy Writ and ends with the death of the man, with the woman facing a possible murder charge. This is not calculated to indicate approval of sexual relations outside of wedlock, but rather the contrary.

In regard to "community standards," George Browning, the motion picture critic who lives in Baltimore and has written reviews for Baltimore newspapers for many years testified that in his opinion the film did not transgress present day community standards and this testimony was not contradicted. The uncontradicted testimony of the other critics, the producer already referred to, and other testimony mentioned above, indicate that the film does not transgress national community standards. As the film does not violate either community standard we need not decide which community standard applies.

---

time had been elevated to the Court of Appeals, was disqualified to hear the appeal. The judges of the Court of Appeals of New York divided 3 to 3, Desmond, C. J., Burke and Scileppi, JJ. being for reversal of the Appellate Division and reinstatement of the order of the Board of Regents, and Dye, Fuld and Van Vorhis, JJ. being for affirmance. Under the provisions of the New York Constitution, Judge Williams of the Appellate Division, Third Department, was called up to sit with the Court of Appeals, the case was reargued, and Judge Williams cast his vote for reversal so that the Appellate Division was reversed, 4 to 3 (see Trans-Lux Distr. Corp. v. Board, 14 N. Y. 2d 88) although ironically a majority of the Court of Appeals as then constituted if Judge Bergan were included, was of the contrary opinion, Judge Bergan having voted for reversal of the Board of Regents when a member of the Appellate Division. The Supreme Court of the United States granted certiorari, and reversed the Court of Appeals in a *per curiam* opinion filed March 15, 1965 referring to Freedman v. State of Maryland, decided March 1, 1965. As a result of this action by the Supreme Court the film was thereafter exhibited in New York.

7. Commercial Picture Corp. v. Regents, 346 U. S. 587, 74 S. Ct. 286, 98 L. Ed. 329 (1954).

8. Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 72 S. Ct. 777, 96 L. Ed. 1098 (1952).

## III.

In our opinion, the film does not violate the standards of Article 66A, Section 6, assuming, *arguendo,* that they are not too vague and indefinite to be enforced at all.

The definition of "obscenity" in subsection (b) is that the film is obscene "if, when considered *as a whole, its calculated purpose or dominant effect* is *substantially* to arouse *sexual desires and* if the probability of this effect is *so great* as to *outweigh* whatever other merits the film may possess." (Emphasis supplied). It seems clear to us from what has already been stated that both the film itself and the other evidence establishes that it is not obscene under this definition.[9]

Subsection (c) in defining what films tend to debase or corrupt morals states this is its effect "if its *dominant* purpose or effect is erotic or *pornographic; or* if it *portrays* acts of *sexual immorality, lust or lewdness,* or if it expressly or *impliedly* presents such acts as desirable, acceptable or proper patterns of conduct." (Emphasis supplied). Here again the film and other evidence establishes that the dominant purpose or effect is not erotic or pornographic. Nor does it portray acts of sexual immorality, lust or lewdness, as the sexual relationships of unmarried persons are implied and, as already noted, the implied sexual relations are by no means presented as desirable, acceptable or proper patterns of conduct, but rather the contrary is presented.

There is no contention that the film incites to crime as defined in Subsection (d), and obviously it does not.

As we have indicated, however, even if the Maryland standards in Section 6 were violated by the film, the Board could not constitutionally refuse to license it under the *Roth-Alberts* Rule, as amplified and explained, and the finding of the lower court to the contrary was clearly erroneous and its order must be reversed.

---

9. We held that nudity, as such, was not obscene under Section 6 in Fanfare Films v. Censor Board, 234 Md. 10, 197 A. 2d 839 (1964) involving the motion picture "Have Figure—Will Travel," following our decision in Board of Censors v. Times Film, 212 Md. 454, 129 A. 2d 833 (1957). In the case at bar, however, there is no nudity involved.

Horney, J., filed the following dissenting opinion, in which Sybert, J., concurred before retirement.

It seems to me that the majority of the members of this Court, in approving a film portraying overt acts of illicit sexual intercourse, has gone further than even the majority of the Supreme Court of the United States has required, and, in so doing, has disregarded the Maryland statute which prohibits the showing of unlawful and immoral sexual relations. If such illicit acts are not obscene, it is difficult to envisage what, other than hard-core pornography, would constitute obscenity.

In my opinion, the order of the lower court affirming the refusal of the State Board of Censors to license the motion picture, "A Stranger Knocks," should not have been reversed. For, when these illicit acts of sexual gratification, the elimination of which, as the producer admitted, "would virtually destroy the film as a serious motion picture," are considered (either with or without the remainder of the film), it is clear that the dominant effect of the film, even assuming this was not its calculated purpose, is to arouse lascivious thoughts or desires which is expressly prohibited by § 6(b) of Art. 66A. Surely, a film such as this, wherein the exhibition of inhibited acts of sexual immorality between an unmarried man and woman leaves nothing to be surmised, will indubitably be taken by the viewing public as sanctioning or approving such acts as desirable, acceptable or proper patterns of behavior contrary to the provisions of § 6(c) of Art. 66A. Such a portrayal of immorality can hardly be said, as the majority hold, to be a serious work of art dealing with a subject of social importance that does not appeal to prurient interest.

On the contrary, for the reasons stated above, it seems obvious to me that the film goes far beyond what is permitted under the *Roth-Alberts* test—set forth in *Roth v. United States* (and *Alberts v. California*), 354 U. S. 476 (1957)—which, as amplified in *Jacobellis v. Ohio,* 378 U. S. 184 (1964), is still the law of the land, and the standards to be applied in determining what is and what is not obscene are still those of the local community and not those of the nation as a whole. Furthermore, it should be pointed out that the case at bar is clearly distinguishable from *Jacobellis* on the facts in that in *Jacobellis*

the sexual act was a fleeting one while in this case both acts were not only protracted but were deliberately over-emphasized by extraordinary demonstrations of satisfaction on the part of the female participant. Other than this, as Judge Prendergast pointed out, there is a vast difference between what is written as poetry or prose and that which is vividly portrayed on a motion picture screen. On the one hand that which is written may be so phrased as not to be erotic or pornographic, while on the other hand sexual activity shown on a screen could be, as it was here, unlawful obscenity.

Judge Sybert, who participated in the consideration of this case, collaborated in the writing of this dissent before his retirement.