## SANZA *v.* MARYLAND STATE BOARD OF CENSORS

[No. 35, September Term, 1966.]

## FERRIS, Etc. *v.* MARYLAND STATE BOARD OF CENSORS

[No. 152, September Term, 1966.]

322

324

*Decided February 8, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ., and ORTH, J., Associate Judge of the Court of Special Appeals, specially assigned.

*Lawrence B. Coshnear,* with whom were *James R. White, A. David Gomborov* and *Silbert & Gomborov* on the brief, for appellants.

*Fred Oken, Assistant Attorney General,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

The Circuit Court of Baltimore City affirmed the actions of the Maryland State Board of Censors in disapproving the licensing of a series of silent sixteen millimeter films designed for showing in coin operated machines in an amusement arcade in the area of Baltimore City known as "the Block." Of the twenty-five films submitted to the Board by the appellant Sanza, five were chosen by stipulation of the parties to stand the test of judicial determination under Code (1966 Supp.), Article 66A (the Act), Section 19. Some weeks after the hearing before Judge Harris and the order thereon, the appellant Ferris submitted three similar films to the Board. These films were also disapproved, and, at another hearing, Judge Harris again affirmed the Board's action.[1] After the appeal from Judge Harris' order sustaining the Board's disapproval of the Ferris application, the appellants moved to consolidate the cases on the grounds that the appellants own and manage the same business at the same location and that both appeals involve the same subject matter and present the same legal issues. We granted the motion. The same law firm represented both Sanza and Ferris at the hearings below and on these appeals. In view of the identity of the subject matter and nature of all the films involved, and of the appellants' motion to consolidate for the purposes of the appeal, we take all motions made on behalf of either appellant as made on behalf of both appellants and as applicable to both proceedings, and we consider all the testimony offered at both hearings as applicable to each of the two series of films.

The appellants contend that the Board has not met the burden imposed on it under the 1965 amendment of the Act and our decisions thereon of proving the films obscene; and that, in any case, the Act has constitutional infirmities which render it invalid. Since *Freedman v. Maryland,* 380 U. S. 51 (1965) and the ensuing reenactment of Section 19 of the Act by Chap-

---

1. The three films involved in the second hearing were of the same type and nature as the five involved in the first hearing, except for the absence of the showing of a certain anatomical detail of the body of the woman who posed for one of the first five films. For the purposes of this decision, we disregard the particular explicity in the first series.

ter 598 of the Laws of 1965, we have decided five cases involving the validity of Board actions refusing the application for licenses for the showing of motion pictures. *Trans-Lux Distributing Corp. v. Board of Censors,* 240 Md. 98, 213 A. 2d 235 (1965) ; *Dunn v. Board of Censors,* 240 Md. 249, 213 A. 2d 751 (1965) ; *Hewitt v. Board of Censors,* 241 Md. 283, 216 A. 2d 557 (1966) ; *Leighton v. Board of Censors,* 242 Md. 705, 218 A. 2d 179 (1966) ; and *Hewitt v. Board of Censors,* 243 Md. 574, 221 A. 2d 894 (1966). In some of these cases we discussed and, in effect, decided the constitutionality of certain provisions of Article 66A, but each decision (other than the first *Hewitt* case, which held invalid the procedure of the lower court in ascertaining and admitting the opinion of a panel of jurors on the question of obscenity) turned on whether, on the particular facts, the Board had met the burden imposed upon it by the statute of proving the films were obscene under the *Roth-Alberts* test. As to each of the four films involved, the Court held the burden had not been met. We shall, therefore, first consider whether there is sufficient evidence to support the Board's findings that the films involved in this case are obscene.

I

The *Roth-Alberts* test of obscenity, *Roth v. United States,* 354 U. S. 476 (1957), reiterated in *Jacobellis v. Ohio,* 378 U. S. 184 (1964), is summarized in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General* (the "Fanny Hill" decision), 383 U. S. 413, 418, 16 L. Ed. 2d 1, 5-6 (1966), as follows :

> "We defined obscenity in *Roth* in the following terms : '[W]hether to the average persons, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest.' 354 U. S. at 489. Under this definition, as elaborated in subequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary

community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

The films here involved are designated only by several numbers. They have no titles and no sound effects. Prior to their submission to the Board, they had been shown in slot or coin machines in an arcade at 411 E. Baltimore Street. Evidence as to the character of the neighborhood was admitted by the court below, on the Board's proffer that the manner in which the allegedly obscene material is presented is relevant under *Ginzburg v. United States*, 383 U. S. 463, 16 L. Ed. 2d 31 (1966). An employee of the Board testified that "the Block" in which the arcade is located contains nine night-clubs, four book shops, and a burlesque house. The employee testified further that when she went to the arcade in which the films were being exhibited prior to their submission for licensing the bars and night-clubs advertised their "girlie" revues by displaying photographs of women almost totally nude. The book stores in the section sold paper-back books which revealed on their covers nude males and females, with the genitals and pubic area exposed. One side of the arcade in which the films were being shown presented a large placard advertising "Hollywood Models on Parade," and displayed pictures similar to those in the night-club advertisements. The front half of the arcade was taken up with several pin-ball machines, a cigarette machine and a peanut machine. The rear half was partitioned off and contained twenty-one peep-show type, coin-operated viewing machines, accessible only to persons over 18 years of age.

The films are viewed by customers in booths. The customer enters a booth and deposits either ten or twenty-five cents; the coin releases a portion of the film for viewing; after that portion has been shown, the film automatically stops until another coin is deposited in the machine. To see an entire film, the customer usually has to deposit four coins.

Each of the eight films involved shows one or more young women on a bed, sofa, or stool, clad in fragmentary undergarments of all or substantially all of which she voluptuously divests herself. Through the entire film, each woman writhes in various poses, clearly inviting and then simulating sexual in-

tercourse. Judge Harris, in his two opinions, describes each of the films in detail, and our viewing of the films enables us to say that his descriptions are accurate, except that we do not agree with his findings that the films necessarily suggest sexual perversions. We do not rest our decision in any way upon the findings by the court below of the portrayal of sexually deviant practices.

At the court hearings the Board adduced a number of witnesses, two of whom we find were qualified as experts in their particular field under the requirements set forth in the second *Hewitt* case. Dr. Robert M. Bidaver is Director of Psychiatric Education for the State of Maryland, Department of Mental Hygiene. Born in Minneapolis, Minnesota, he lived in the midwest during the early part of his life. He was graduated from Columbia University and studied medicine at the City University of New York, interned at the University of Maryland and the University Hospital, had three years postgraduate training at the Yale Institute and has been on the faculties of the Johns Hopkins Hospital and the University of Maryland. He was Chief of the Psychiatric Section of Medical Service, United States Army. He had viewed the films, and testified that:

> "Clearly to my thinking the dominant theme and my professional statement of the films was the visual selling of sexual and neurotic pleasure * * * the intent as I perceived it and the effect of the movements and gyrations of the several women portrayed were to evoke sexual and neurotic feelings, to arouse these and force them upon any viewer's mind, to focus attention on the most sexual, provocative area of the female, intimate in our culture and to urge upon the viewer by means of photography by exhibiting certain elements of parts of the body to arouse sexual feelings in people."

In his opinion, the films would appeal to the prurient interest of the average man. He testified further that:

> "As a professional opinion, based on a wide knowledge of human behavior, or in thousands of individuals, a close-up and discussions at numerous tests of personal lives of what does and what does not arouse

our sexual feeling, my professional opinion would be, without basing it on actual syndromes, that such films do have sexual arousement."

The late George Browning had been connected with the newspaper business practically all his working life. He was a drama and motion picture critic for the Baltimore News and earlier, for the Post for at least fifteen years, and, for a short period, had been a critic on the New York World Telegram. At the time he testified, he was executive secretary of the Motion Picture Owners Association and reviewed motion pictures periodically, although not regularly, for out-of-town publications with nation-wide circulation, including "Box Office," published in Kansas City and Motion Picture Daily in New York.[2] He testified that the five films which he had veiwed had absolutely no theme. He did not think he was qualified to testify as to national community standards, but, on the basis of local community standards, he was of the opinion that the films went beyond customary limits of candor in portraying sex.

The appellants adduced no testimony of any kind that the films involved have any literary, educational or social value. Mr. Sanza testified that the five films first reviewed had not, as far as he knew, been shown in any other city. The films had been produced, he believed, in California; he did not know who produced them or made them. They were ordered by catalog. The types of films involved are referred to in the trade as "art," "bikinis," "pinups" or "beavers." He was asked by the court in what parts of the film there is art and answered:

"Well, you take a model, when she has to do a show, or a strip artist in a burlesque show, when she strips off her clothing she is performing art according to the

---

2. Mr. Browning had also testified in two of the motion picture cases previously before this Court. His testimony was referred to in Trans-Lux v. Board of Censors, 240 Md. 98, 113, 213 R. 2d 235 (1965) and Hewitt v. Board of Censors, 243 Md. 574, 591-92, 221 A. 2d 894 (1966). In the first of these cases, he testified that the film "A Stranger Knocks" did not transgress present day community standards; and, in the second, that the film "This Picture is Censored" was propaganda against censorship and presented an issue of social importance.

burlesque house. That's all this girl is doing, is to strip her clothing off and make different poses with her body. You can take the same pictures in a camera club. You can get a girl who will take her clothing off, she will strip down to her panties, and roll over this way or roll over that way, and people take pictures of it * * * This is art. The field has been broadened so much in the last ten years nobody can determine what is art and what isn't art. There is no more obscenity in these films here than you can buy on any news stand in the United States."

In determining whether the films are obscene, we are deeply mindful of our obligation to make an independent constitutional judgment on the facts of the case, *Jacobellis, supra,* at 378 U. S. 190, and that the administration of a censorship system for motion pictures presents peculiar challenges to constitutionally protected speech. *Freedman, supra,* at 380 U. S. 57. We are mindful too that "we are judges, not literary experts or historians or philosophers," *Fanny Hill, supra,* concurring opinion of Mr. Justice Douglas at 383 U. S. 427, and that ordinarily neither the judge who may sit in the circuit court to review the action of the Board nor the judges of this Court would be qualified to determine whether a film fails to meet the three tests laid down in *Roth-Alberts* without enlightening testimony. *Dunn, supra,* 240 Md. at 255.

While we are not experts, there are uncontradicted facts in respect of the eight films before us which, in our opinion, are weighty in the determination we must make. Each of the films appeals to an interest in sex, and nothing else. Sex is not only the dominant subject in each, it is the only subject; there is nothing in any of the pictures except the "strip-tease," the obvious invitation and prelude to intercourse and then the simulation of the act. There is no story, no background, no character other than the writhing woman. In *Trans-Lux, supra,* this Court held that the Board had not met its burden of showing that "A Stranger Knocks" was obscene, even though there were several scenes portraying sexual intercourse, because we found the dominant theme of the picture was not erotic or pornographic. The Supreme Court came to a similar conclusion

in *Jacobellis* as to the film "The Lovers" although that picture, too, had "an explicit love scene." In the films before us, the portrayal of the sexual act on the part of the woman is not essential to a story, as it was in "A Stranger Knocks", or to a final incident, as in "The Lovers"; it is the core and only substance of each picture.

There is no pretense that any film has any social value, redeeming or otherwise. In the second *Hewitt* case, we found evidence of redeeming social value in the claim that the picture "This Picture is Censored" was an argument against censorship, even though, in fact, the scenes were not actual excisions from censored pictures. In this case, not a modicum of such value is apparent or claimed.

The films are not shown in a theatre, but are viewed only by a single spectator in a booth. Margaret Mead, the anthropologist, points out the distinction between "the pornographic, condemned in every society, and the bawdy, the ribald, the shared vulgarities and jokes, which are the safety valves of most social systems." She contrasts the music hall with "the pornography primarily designed to be brooded over in secret." Mead, *Sex and Censorship in Contemporary Society,* New World Writing 7, 23-24 (New American Library 1953). In the case before us, the films are part of an apparatus often referred to as a peep show, in which the solitary observer pays, minute by minute, for the gratification of his voyeurism.

In determining whether, under these circumstances, the films are obscene, the expert testimony adduced by the Board, to which we have referred, is enlightening. The gist of Dr. Bidaver's testimony was that the theme of the film is an appeal to a prurient interest in sex. Mr. Browning was of the opinion that the material goes substantially beyond customary community limits of candor in the portrayal of sexual matters. While Mr. Browning confined his opinion to local standards, Dr. Bidaver's testimony was not so limited. His experience, particularly as Chief of the Psychiatric Section of the Army Medical Service, was on a national basis. Asked whether the pictures would affect a great many average persons throughout the United States, he said that he thought the pictures are sensual and arousing to the average individual.

The appellants offered no testimony in contradiction to that of Dr. Bidaver and Mr. Browning. They contend, however, that the pictures have not been proved to be obscene because there is not sufficient evidence that they affront contemporary community standards. They argue that there is no evidence that national community standards are affronted, and that if local community standards are to be taken, then toleration of "the Block" by local authorities shows that the exhibition of the films in that section of Baltimore would not violate the standards of the community. The Board argues that these very conditions in "the Block" tend to prove the film is obscene under the five to four decision of the Supreme Court in *Ginzburg* that the manner in which the material is promoted may be relevant in the determination of whether it is obscene.

As Judge Barnes, for the Court, pointed out in *Trans-Lux,* at 240 Md. 104-05, a majority of the Justices of the Supreme Court have not as yet agreed on whether the "community" involved in the *Roth-Alberts* test is local or national. If the test be on a local basis, it is true that "the community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates." Opinion of Mr. Justice Harlan, concurring in part and dissenting in part, *Smith v. California,* 361 U. S. 147, 171 (1959) ; *Yudkin v. State,* 229 Md. 223, 229-30, 182 A. 2d 798 (1962). However, the only relevant evidence on the record before us as to conditions on "the Block" is that the section contains a number of night-clubs and a burlesque house, is saturated with photographs of almost nude women, and that the book stores in the section sell books with pictures of nude males and females on their covers. Nudity is not necessarily obscenity. *Sunshine Book Co. v. Summerfield,* 355 U. S. 372 (1958) ; *Monfred v. State,* 226 Md. 312, 316, 173 A. 2d 173 (1961) ; *Excellent Publications, Inc. v. United States,* 309 F. 2d 362, 365 (1st Cir. 1962) ; and see Annot., "Modern Concept of Obscenity," 5 A.L.R.3d 1158, 1176 (1966). If it be assumed that in the night-clubs and burlesque house in "the Block" there are jokes and scenes of a ribald or bawdy kind, that assumption does not lead to the conclusion that obscenity of the nature of the films here involved is present or would be tolerated. "Sex and obscenity are not synonymous." *Roth,* at 354 U. S.

487; 5 A.L.R.3d, *supra,* at 1175-76 and cases therein cited; see also Mead, *supra.* We find no evidence on the record before us that, even in "the Block," the community has tolerated such patent obscenity as that which is the substance of the films.[3]

Nor do we agree with the appellants' contention that there is no evidence that national standards have been affronted. While most of Dr. Bidaver's testimony went to the effect of the material on the prurient interest of the average man, he also testified that, while the gyrations shown on the films might be acceptable between husband and wife, "the performance for anybody else would be beyond the bounds of propriety." Unlike the situation as to the films "A Stranger Knocks" (*Trans-Lux*) and "Lorna" (*Dunn*) there was no showing by the appellants that the films had been exhibited elsewhere in the coun-

---

3. "The Block" has achieved a national and even international notoriety. "Among its tourist attractions, Baltimore boasts of succulent crab cakes, miles and miles of red-brick row houses, and the fourth busiest harbor in the nation. It quickly glides over its most famous tourist lure, the seamy, sinful strip known as 'the Block,' * * *" (Time, p. 28, February 4, 1966). A recent travel guide describes "the Block" as follows:

> "[A] neon bright strip that features the usual strip joints, burlesque, musical bars, penny arcades, shooting galleries, and, for anyone so inclined, tattoo parlors. The Block, like Boston's now dead Scollay Square, itself is justly famous and enjoys the greatest amount of police protection of any part of the city, although it's not really as sinful as the notorious Phoenix City * * *" (Fodor Shell Travel Guides USA Mid Atl. by Fodor, Fisher & Laschever, editors (1966)).

Louis Azrael, in his column in the Baltimore News-American of January 10, 1967, quotes from a three-column article in the Sunday Mirror, published in Sydney, Australia, which, on the basis of observations made in "the Block" calls Baltimore "the wickedest city in America." Mr. Azrael suggests that the Mirror "is one of the tricky ones which exaggerate the subject's image."

Whether "the Block" deserves its notoriety, and, if it does, whether the conditions are the result of toleration by the community, are issues beyond the evidence in the record in this case. That the Board seeks to prevent the showing of obscene motion pictures in this section may be taken as evincing the State's intent, under its police power, to cope with the problem. See Times Film Corp. v. Chicago, 365 U. S. 43 (1961).

try; indeed, the appellant Sanza admitted that, as far as he knew, they had not been shown except in Baltimore. Finally, with the gloss of Dr. Bidaver's uncontradicted testimony, the pictures speak for themselves.

We do not deem it necessary to decide whether the methods of advertising the showing of the films in the arcade and the location of the booths within the area of "the Block" constitute "pandering" under the *Ginzburg* doctrine. However, in determining whether the films are obscene we do consider, *inter alia*, the method in which the films are shown—the viewing in a booth by a single spectator, in the position of a peeping Tom, who feeds his coins into the machine presumably in the hope that he will be even more titillated by what will come than by what has gone before. We believe that the manner of the particular presentation is relevant to a consideration of whether the film is an appeal to prurient interest, not only under *Ginzburg*, but under the *Roth-Alberts* test before *Ginzburg* was decided.

Based on the nature of the films, the manner of their showing, on what we find to be their obvious intent and purpose and on the expert, uncontradicted testimony to which we have referred, we hold that the subject of the films as a whole and in every part appeals to a prurient interest in sex; that the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters, whether these standards be taken on a local or national basis; and that the material is utterly without redeeming social value.

## II

The appellants contend that Section 3 of the Act is unconstitutional because it does not provide adequate standards for the selection of the members of the Board of Censors. That Section states that the Board "shall consist of three residents and citizens of the State of Maryland, well qualified by education and experience to act as censors under this article."

The rule of administrative law that the discretion entrusted to an agency must be circumscribed by reasonably definite standards (see Cohen, "Some Aspects of Maryland Administrative Law," 24 Md. L. Rev. 1, 3-8 (1964) and authorities therein

cited), goes to the delegation of power to the agency by the legislative body; it does not go to the exercise of the executive power to appoint the members of the agency. "The appointing power must determine the fitness of the applicant; whether or not he is the proper one to discharge the duties of the position. Therefore it is one of those acts over which the courts have no general supervising power." *Keim v. United States,* 177 U. S. 290, 293 (1900). See also *Scholle v. State,* 90 Md. 729, 743, 46 Atl. 326 (1900).

*Zenith International Film Corp. v. City of Chicago,* 291 F. 2d 785 (7th Cir. 1961), cited by the appellants, does not support their position. There, the Chicago ordinance made it unlawful for a film to be publicly exhibited without a prior permit from the Commissioner of Police. The Commissioner delegated his power of censorship over the film involved to a Film Review Board, for which the ordinance made no provision. The court held that Zenith had been deprived of its right to a full and fair hearing under the ordinance. The opinion emphasizes that the Board is not a creature of the ordinance, as far as the record reveals; and, in the context of that fact, states that there are no standards of appointment or opportunity for public hearing, argument or the introduction of evidence. In the present case, the Board is a creature of the Act and standards have been set up by the Legislature for the exercise of its discretion. The 1965 amendment to the Act provides full opportunity for a court hearing. In this case, the Legislature has provided criteria for the exercise of the Governor's discretionary power of appointment. Even were those criteria subject to the test of definiteness, we think that the language "well qualified by education and experience to act as censors" is sufficient.

In the briefs and arguments before us, the appellants contend that the members of the Board are not qualified by education or experience to act as censors. It is well established in this State that mandamus is the proper remedy to try title to public office; in such an action, the attack may be made by a taxpayer. *Carey v. Jackson,* 165 Md. 472, 169 Atl. 922 (1934). Under some circumstances, where the validity of an appointment is a question, but not the primary question, the jurisdiction of equity has been upheld. *Miller v. County Comm'rs,* 226

Md. 105, 114, 172 A. 2d 867 (1961). In that case, a taxpayer asked injunctive and declaratory relief on the ground that the municipal corporation had acted *ultra vires* in creating a position and then making an appointment to the office so created. In the case before us, the appellants did not attack the validity of the appointments to the Board until, at the conclusion of the testimony in the court below, they moved to dismiss the Board's petitions. So far as the record discloses, no objection was made to the Board in respect of the qualifications of its members prior to or during the Board's examination of the films under Section 6 of the Act. When the Board filed its petition for judicial determination as to whether the Sanza films were obscene, Sanza's answer did not raise any question of the validity of the appointment of the Board's members. Ferris filed no answer to the Board's petition as to his films, but moved to dismiss the petition on several grounds which did not include the objection here considered. Under these circumstances, the appellants are not in a position to contend that the *Miller* exception to the rule that mandamus is the proper remedy to try the validity of an appointment is applicable. On the contrary, the facts in this case emphasize the applicability of the general rule. It would be deleterious to the orderly administration of a State law if the eligibility of the officers appointed to administer the law could first be made years after the appointments in a procedure of the nature here involved. In *Miller,* at 226 Md. 121, Chief Judge Brune, for the Court, added by way of postscript to his opinion that "it appears quite probable that by reason of the lapse of time" any lack of qualifications of the office holder had "long since been cured." Similarly, it may be observed in this case that the two members of the Board whose alleged lack of qualifications was made the basis of the appellants' objections had acquired ample experience and education in the field of censorship during the five and seven years since their respective appointments.

The appellants stand on firmer ground in their attack upon the overbroadness of the standards set forth in the Act for the exercise of the Board's discretion in approving or disapproving a film. As the Board properly concedes, this Court has already

held most of these standards to be constitutionally invalid.[4] In *Dunn,* Judge Hammond (now Chief Judge) said, for the Court, at 240 Md. 252-53 and 254:

> "It seems too plain for serious doubt that the legislative direction in Code (1957), Art. 66A, Sec. 6, that the Board shall disapprove such films '* * * as are obscene, or * * * tend, * * * to debase or corrupt morals * * *' (even as limited by the definitions of the terms 'obscene' and 'tend to debase or corrupt morals' spelled out later in Sec. 6) is so broad as to be fatally at variance with the rulings of the Supreme Court as to what the State constitutionally can ban from the public's viewing.
>
> * * *
>
> "We hold that the right and power of the Board to ban films as 'obscene' or as tending to 'debase or corrupt morals' under Sec. 6 of Art. 66A extends only to motion pictures which are obscene under the *Roth* test referred to and paraphrased in *Trans-Lux* and in this opinion. The cases of *Kingsley Int'l Pictures Corp. v. Regents of Univ. of N. Y.,* 360 U. S. 684, 3 L. Ed. 2d 1512, and *Roth* and *Jacobellis,* following *Winters v. New York,* 333 U. S. 507, 92 L. Ed. 840, and *Joseph Burstyn, Inc. v. Wilson,* 343 U. S. 495, 96 L. Ed. 1098, make it manifest that only material which is obscene under the *Roth* test can be censored or suppressed by a state, and that a state may not effectively substitute its definition of what is obscene for the *Roth* definition. The Maryland definition of what tends to debase or corrupt, found in Sec. 6, is almost word for word that of the New York statute which was held unconstitutional in *Kingsley*."

---

4. When, in Trans-Lux Distributing Corp. v. Board of Censors, 240 Md. 98, 102, 213 A. 2d 235 (1965), Judge Barnes said, for the Court, that "the present Maryland statutory plan for pre-showing motion picture censorship is constitutional on its face," as the portions of the opinion which follow make clear, he was referring only to the procedure established by the 1965 amendment to the Act.

Judge Hammond said further, at 240 Md. 254, "The Maryland definition of 'incite to crime' is highly suspect, if not entirely invalid * * *" We now hold that standard to be so vague that it is unconstitutional. Similar clauses in penal statutes have been held invalid; *Winters v. New York*, 333 U. S. 507 (1948) ; *Police Comm'r v. Siegel Enterprises, Inc.*, 223 Md. 110, 162 A. 2d 727 (1960), because of the danger of tolerating in the area of First Amendment Freedoms the existence of standards "susceptible of sweeping and improper application." *Freedman, supra*, at 380 U. S. 56. We think the standard equally objectionable when it is part of the "apparatus of censorship." *Freedman, supra*.

The only valid standard for disapproval of a film under the Act, therefore, is obscenity. As *Dunn* makes clear, that standard is limited to what can be deemed obscene in the constitutional sense. The term is not susceptible of definition, any more than is the loftier concept of due process of law, but it is an inherent part of our system of constitutional government that broad concepts take on definite meaning only as the ground covered by the concept is marked out case by case. *Davidson v. New Orleans*, 96 U. S. (6 Otto) 97, 104 (1877). The question which then arises is whether the invalidity of the other standards of Section 6 of the Act renders the entire Act unconstitutional, despite the severability clause contained in Section 24.

The presence of a severability clause raises a presumption of severability, but the clause is merely declaratory of an established rule of construction; it is "an aid merely, not an inexorable command." The test is, would the legislative body have enacted the statute or ordinance if it knew that part of the enactment was invalid? *City of Baltimore v. Stuyvesant Ins. Co.*, 226 Md. 379, 390, 391, 174 A. 2d 153 (1961) ; *City of Baltimore v. A. S. Abell Co.*, 218 Md. 273, 289-91, 145 A. 2d 111 (1958), and cases therein cited. In *Stuyvesant, supra*, we held the ordinance therein involved was separable and that, while parts were invalid, the remainder was valid, even though the ordinance contained no severability clause. In *Baltimore v. Abell Co., supra*, despite the presence of a severability provision, the Court held the Mayor and City Council would not

have adopted the ordinances if it had known they could be only partially effectual.

Section 6 (a) of the Act states that the Board shall disapprove such films "as are obscene." The other reasons for disapproval which follow are stated in the disjunctive. Section 6 (b) deals with what films are to be considered obscene. While some of the criteria which follow are impermissibly vague, the legislative intent to authorize the Board to disapprove films which are obscene by any valid test seems clear. In the recent cases before us, the Board has demonstrated that, in practice, the "obscene" standard of Section 6 can be treated as severable by limiting its findings of obscenity in accordance with the *Roth-Alberts* criteria, as the Board understands them. We hold that, faced with the eventuality that all of the standards for disapproving a film would be declared invalid other than obscenity in the constitutional sense, the Legislature nevertheless would have passed the Act.

The appellants contend also that the Act is unconstitutional in respect of its coverage; that an overly broad discretion is delegated to the Board as to the films which may be censored, in violation of the due process clause of the Fourteenth Amendment; and that the exemptions from censorship deny the appellants the equal protection of the laws under that Amendment. We find these contentions to be without merit.

The argument that the Board's licensing discretion under the Act is overly broad rests on the assumption that the Act applies to films and views shown for non-commercial as well as commercial purposes. On this assumption, the appellants contend that a person exhibiting a home moving picture or a store selling a scenic slide would be required under the Act to submit the film or view to the Board for approval and licensing. However, we believe the assumption to be erroneous. While the definitions of "film" and "view" in Section 1 of the Act are not expressly restricted to films and views to be shown commercially for profit, such an interpretation, in our opinion, is the only one consistent with the legislative intent as expressed and implied in the Act as a whole.

For the constitutional reasons previously considered, a legislative enactment providing a system of pre-showing censor-

ship, like a penal statute, is to be strictly construed. The definitions of the words "film" and "view" in Section 1 state that the words shall be construed to include what is "usually" meant by the respective terms. This language of the Act, in our opinion, calls for construction, and when there is occasion for construction, the Court, in determining legislative intent, will consider not only the literal meaning of the words "but their meaning and effect considered in the light of the setting, the objectives and purposes of the enactment, and the consequences that many result from one meaning rather than another * * * with the real legislative intent prevailing over literal intent." *Height v. State,* 225 Md. 251, 257, 170 A. 2d 212 (1961). "[T]he construction should be in harmony with the manifest intent of the act and should not lead to an absurdity." *Gatewood v. State,* 244 Md. 609, 224 A. 2d 677, 682 (1966), and cases therein cited.

Under a literal construction, the Act would mean, as the appellants argue it does mean, that a Baltimore department store could not sell a slide of the Washington Monument without first submitting the view to the Board for approval. The illustration itself is a *reductio ad absurdum* of the argument that the Act should be given the sweeping construction which alone could bring about such a result. Section 7 requires a certificate to be shown on each approved film that it has been "Approved by the Maryland State Board of Censors." We do not believe the Maryland Legislature could ever have intended that a *pater familias* could not show in his home a moving picture which he has taken of his children without first obtaining the Board's approval and then affixing the certificate to the film. Yet, literally construed, the Act would require such a procedure.

In support of their contention that the Act must be given a broad interpretation as to its coverage, the appellants cite the language of Section 23. That Section reads in part as follows:

"This article shall not apply to any noncommercial exhibition of, or noncommercial use of films or views, for purely educational, charitable, fraternal or religious purposes, by any religious association, fraternal society, library, museum, public school, private school or institution of learning."

The appellants argue that the Section does not exempt all non-commercial exhibitions of films or views, and that, therefore, all films and views not included in the exemption are covered. In our opinion, however, the exemption may well be taken to have been enacted so as to preclude the application of the Act to the showing of films or views for money if the money is collected by the designated non-profit organizations. So construed, the exemption is consistent with an interpretation of the Act which limits its application to films and views to be shown for an admission charge, except when shown by public associations or institutions which do not operate for profit.

At the hearing below, a member of the Board testified that the Board has never applied the Act, to her knowledge, except in accordance with this interpretation. Consistent, long-continued, unvarying administrative construction of a statute will be given great weight. *State Roads Comm'n v. Jones*, 241 Md. 246, 256, 216 A. 2d 563 (1966), and cases therein cited. In this case, we find that the administrative construction has been in accord with the legislative intent.

The exemptions granted by Section 6 (a) of the Act for the showing of current events and pictorial news and the exemption for charitable, educational and other non-profit organizations under Section 23 represent reasonable, valid classifications. They do not violate the equal protection clause of the Fourteenth Amendment or the provisions of the Maryland Declaration of Rights. *McGowan v. Maryland,* 366 U. S. 420 (1961) ; *Murray v. Comptroller,* 241 Md. 383, 392-97, 216 A. 2d 897 (1966), *cert. denied,* 385 U. S. 816 (1966) ; *Tatelbaum v. Pantex Mfg. Corp.,* 204 Md. 360, 370-73, 104 A. 2d 813 (1954). On the contrary, the granting of the exemptions by the Legislature, like the limitation by this Court of the standards in the licensing of films to the single issue of obscenity, and the restricted interpretation of the scope of the Act as a whole, are recognitions of the dangers inherent in the apparatus of censorship, an apparatus, in the words of the Supreme Court in *Freedman,* "always fraught with danger and viewed with suspicion * * *" 380 U. S. at 57.

> *Orders affirmed; costs to be paid by appellants.*