SYLVAN MARSHALL LANCASTER *v.*
STATE OF MARYLAND

[No. 452, September Term, 1968.]

*Decided September 9, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Earl E. Manges,* with whom was *John C. Sullivan* on the brief, for appellant.

*John J. Garrity, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Donald W. Mason, State's Attorney for Allegany County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant was charged by criminal information with having on September 9, 1968 in Allegany County, Maryland, possessed, distributed, and sold an obscene motion

picture film in violation of Section 418 of Article 27 of the Maryland Code (1968 Cum. Supp.).[1] He was subsequently convicted by the court sitting without a jury and fined $500.00. On this appeal he contends that the film was not obscene under the constitutional standards articulated in recent cases of the Supreme Court of the United States.

The State, adduced evidence at the trial showing that appellant traded as B & M Enterprises of Frostburg, Maryland; that B & M Enterprises was listed by name, address, and code number as a supplier of "Sex-Aid Products" in a directory distributed by an Indianapolis firm at a price of $3.50 per copy; and that in a companion publication purporting on its cover to describe "all the unusual, exotic, rare and unique things for Adults," B & M Enterprises was identified solely by its code number as having the following items available for sale:

> "French Ticklers. Penis reproductions, extensions, sex aid products, rubber goods. Free Literature and price list."

Using the test name of "Red Hays" of Brandy Station, Virginia, Postal Inspector John Bennett contacted B & M Enterprises by letter dated May 21, 1968, making inquiry concerning "sex aids for middle-age men" and "whether you have the right kind of movies or know where I can get them." In response to this inquiry, B & M Enterprises promptly sent Bennett a mimeographed brochure containing a description of its "Sex Aid products" which in-

---

1. Section 418—

"Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this State for sale or distribution, or in this State prepares, publishes, prints, exhibits, distributes, or offers to distribute, or has in his possession with intent to distribute or to exhibit or offer to distribute, any obscene matter is guilty of a misdemeanor." The term "obscene," as used in Section 418, was intended by the Legislature to have the same meaning as that constitutionally ascribed to the term by decisions of the Supreme Court of the United States. See *Donnenberg* v. *State*, 1 Md. App. 591. By Section 417, the term, "matter," as used in Section 418, includes a motion picture film.

cluded, among others, "French Ticklers, best grade;" sex books, "Guaranteed to please;" nudist photos; and penis extensions (described in considerable detail). Also advertised was an 8 MM "Stag Film" purporting to show:

> "* * * the kind of Movies you have been looking for. These are real skin films of Men and Women in action. No junk. Good clear film with plenty action and plenty close ups. Imported from Europe. $30.00 a reel."

In addition to these "Sex Aid products," B & M's advertisement also featured "Action Cards," consisting of a regular sized deck of cards upon which were allegedly depicted "52 different poses of Men and Women in action." Accompanying the mimeographed list of B & M's sex aid products sent to Bennett was a sample "Action Card" showing the full face and body of a nude woman perched, sans expression, upon the erect penis of a reclining faceless nude male. The sample "Action Card" carried the caption: "Films has same action." B & M's advertisement concluded with the notation that it did not sell to minors. The document was mailed to Bennett in a plain white envelope, bearing the return address of appellant's residence in Frostburg.

On June 4, Bennett placed an order by mail for one penis extension and for the motion picture film and enclosed a $40.00 money order payable to B & M Enterprises. The money order was promptly cashed at a food store in Frostburg, showing the endorsement, "B & M Enterprises, S. M. Lancaster." The evidence showed that on September 9 appellant went to the post office in Frostburg and personally mailed the film. Inspector Bennett was immediately notified by the Postmaster in Frostburg that the film had been deposited in the mail and he went to Frostburg where he viewed the film on September 10.

The film was received in evidence and viewed by the trial judge.[2] It contained no audio or textual portion and

---

2. Prior to oral argument of the appeal, we also viewed the film.

lasted about twenty minutes. Only two persons appeared in the film, one a thin, somewhat emaciated looking nude male, having a large, thick penis, and the other, a young lady, who first appeared on screen wearing only stockings and panties. After she shed her undergarment, the film showed a close-up shot of her pubic area which was followed by a scene depicting the male's hand and mouth stimulating the female's genital area. A close-up shot of the female's legs was next shown, followed by an act of conventional sexual intercourse. Next ensuing were acts of sexual intercourse (a) while standing up, (b) an act of sexual intercourse with the male entering the female by the rear, and (c) an act of intercourse while standing up, with the female wrapped around the male body. Close-up camera shots of these various acts, taken from different angles, were featured. Following this display was a sequence whereby each of the actors hand-stimulated the genitals of the other. The apparent highlight of this film footage was a close-in shot of the female's vaginal area. Subsequently, the female assumed a reclining position. The male then stood over her while she hand-stimulated his erect penis. The male then had an ejaculation, the sperm from which he rubbed into the genitals of the female.[3]

None of the State's witnesses were ultimately permitted to express an expert opinion on the question whether the film was obscene, the trial judge taking the position that no expert testimony was needed to determine the issue. The court nevertheless permitted John St. Leger, the 39 year old librarian at Frostburg State College to testify on appellant's behalf that he had viewed the film; that he had both a Bachelor's and Master's degree in history and a Master's degree in library science; that he had been employed for four years at the Library of Congress as a reference librarian; that while the library of Frostburg State College did not contain any sim-

---

3. The film was shot under obviously inadequate lighting conditions, and was of poor quality.

ilar movies, he was "pretty sure" that the Library of Congress had such films which were accessible to the general public "with good reason" where an individual wanted to do research in psychology and sex; and that he had only viewed one other film similar to the one in question, that being in 1951 while in military service. St. Leger testified that the film "could have been a visual aid, although we didn't have the audio portion," and that "showing the different positions of sexual intercourse * * * could have been an educational aid." St. Leger stated that he didn't understand the word "obscene," and when asked whether in his opinion the film was pornographic, he testified:

> "I think it is the intent of the ultimate consumer. If the ultimate consumer wants a visual aid then I think the film was not pornographic. If the ultimate consumer wanted to use that film to show to his wife to have better sexual relations like that advertised in books, all different positions and so forth and so on, I don't think it is pornographic. I think it is the intent of the purchaser of the film."

Appellant, a tavern operator, offered no testimony in his own behalf.

The verdict of the trial court finding appellant guilty is set forth only in the docket entries which contain the notation "guilty on first count," with the imposition of a $500.00 fine. It appears, therefore, that the trial judge did not specify any reasons for finding the film obscene, although it is probable, from the court's statement that no expert testimony was needed to determine the question, that he considered the film "hard-core pornography."

While sex and obscenity are not synonymous, *Sanza v. Md. Board of Censors*, 245 Md. 319, we think the trial judge correctly determined that the film was obscene in the constitutional sense. We noted in *Donnenberg v. State, supra,* at pages 597-598:

"* * * We understand the *Roth-Alberts*[4] definition of obscenity — 'whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest'— as reiterated in *Jacobellis v. Ohio,* 378 U. S. 184, elaborated in *Ginzburg v. United States,* 383 U. S. 463, adjusted in *Mishkin v. New York* 383 U. S. 502 and summarized in *A Book Named 'John Cleland's Memoirs of a Woman of Pleasure' v. Attorney General,* (the *Fanny Hill* decision) 383 U. S. 413 establishes the following test for obscenity:

"Three elements must coalesce; it must be established that:

1) The dominant theme of the material taken as a whole appeals to a prurient interest in sex.

    a) where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group.

2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters.

3) The material is utterly without redeeming social value.

    Each of the above three federal constitutional criteria must be applied independently and neither be weighed against nor canceled by any of the others.

---

4. *Roth v. United States* and *Alberts v. California,* 354 U. S. 476.

a) As an aid to determining the question of obscenity, the setting in which the material was presented may be considered. Thus evidence of pandering — 'the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest—is relevant' and 'where a purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation on its face value.'

\* \* \*

"\* \* \* The Court of Appeals of this State and this Court have recognized the obligation to make an independent constitutional judgment on the facts of such [obscenity] cases. [cases cited] But we are also mindful that 'we are judges, not literary experts or historians or philosophers,' *Fanny Hill, supra,* concurring opinion of Mr. Justice Douglas, at 383 U. S. 427, and that neither the judge trying the case in the lower court nor the judges of this Court would be qualified to determine whether material meets the requirements of the test of *Roth-Alberts* without enlightening testimony. See *Sanza v. Md. Board of Censors, supra,* page 330. There is an exception with respect to material that is hard-core pornography. We noted in *Levin v. State,* 1 Md. App. 139, that hard-core pornography has been said to be material which 'focuses predominantly upon what is sexually morbid, grossly perverse, and bizarre without any artistic merit or scientific purpose or justification.' There is no desire to portray the material in pseudo-scientific or 'arty' terms. It can be recognized by the insult it offers, invariably, to sex and to the human spirit. It goes substantially beyond customary limits of candor and de-

viates from society's standards of decency in the representation of the matters in which it deals. It has a patent absence of any redeeming social value; it speaks for itself and screams for all to hear that it is obscene. It is not designed to be a truthful description of the basic realities of life as the individual experiences them but its main purpose is to stimulate erotic response. *Hewitt v. Bd. of Censors,* 243 Md. 574. No proof, other than the viewing of it, is required to determine if it is, in fact, obscene. * * *"

We think it entirely clear from the evidence that appellant's only object in selling the motion picture in question was to realize material gain through the film's appeal to the sexual curiosity and appetite of his customers. See *Ginzburg v. United States, supra,* at page 471. Indeed, the film appeals only to an interest in sex, this being not only the dominant subject of the film, but the only subject. See *Sanza v. Md. Board of Censors, supra.* That the film was exploited for the sake solely of its prurient appeal—its erotic interest—to the exclusion of any other value, can hardly be doubted. See *Mishkin v. New York, supra,* footnote 6 at page 508. In short, therefore, all the evidence indicated that the appellant, through his advertising brochure, emphasized only the sexually provocative aspects of his film, *viz.,* "real skin films of Men and Women in action * * * with plenty action and plenty close ups"—"the kind of Movies you have been looking for." No doubt was left as to the nature of the "action." The "Action card" enclosed with the advertisement depicted an act of unconventional sexual intercourse. Under these circumstances, we think it manifest that appellant deliberately represented that his film was erotically arousing in order to stimulate the customer to acquire it for its prurient appeal.

Viewed against such a background, we believe the film qualifies as "hard core pornography," within the defini-

tion of that term set forth in *Donnenberg*. Since the film speaks for itself and screams out for all to hear that it is obscene, no expert testimony was needed to enable the trial judge to properly conclude that it met the three-fold constitutional test of obscenity established by the Supreme Court.[5] Compare *United States v. A Motion Picture Film Entitled "I Am Curious-Yellow,"* 404 F. 2d 196 (2nd Cir.), holding by a divided court that such film was not obscene, with *People v. Pinkus,* 63 Cal. Rptr. 680 (Super. Ct. Cal.), holding, in effect, that a "stag film" was hard core pornography and, as such, required no expert testimony to determine the question.[6] See also *Hewitt v. Maryland State Board of Censors,* 254 Md. 179, where the Court of Appeals, in its latest obscenity case, held the film "Odd Tastes" to be obscene for the reason, among others, that it was hard core pornography; and Annotation, "Modern Concept of Obscenity," 5 A.L.R. 3d 1158-1196.

*Judgment affirmed.*

---

5. While it is not clear whether the trial judge considered St. Leger to be an expert witness, we think it clear that he was in no event bound to accept his appraisal of the film, whatever it was.

6. The film in *Pinkus* depicted young women stripping absolutely naked, "brazenly and shamelessly displaying breasts, genitalia, pubic hair, and the anal area," and engaging in masturbation or motions and gyrations simulating female in sex play and sexual intercourse, with no story line, plot, or social message.