EUROPO BOOKS, INC. t/a Sweden Book Store *v.*
DONALD D. POMERLEAU et al.

[Nos. 1033, 1034, 1035, 1036 and 1037, September Term, 1978.]

*Per Curiam Order November 24, 1978.*

*Opinion Filed January 10, 1979.*

The cause was argued before Gilbert, C. J., and Morton and Couch, JJ.

*Arnold M. Weiner* and *Richard V. Falcon,* with whom were *Gerard P. Martin* and *Ira C. Cooke* on the brief for appellants Europo Books, Inc. t/a Sweden Book Store et al. *Burton W. Sandler* for appellants 400 East Baltimore Street, Inc. t/a Troc Pleasure Palace et al. and Denten Corporation t/a Follies Books et al.

*Jon F. Oster, Deputy Attorney General,* and *F. Todd Taylor, Jr., Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Francis X. Pugh, Assistant Attorney General,* and *John C. Themelis, Assistant State's Attorney for Baltimore City,* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

## PER CURIAM ORDER

"These causes having come before this court on argument after an order of consolidation and advancement it is this 24th day of November, 1978, by the Court of Special Appeals of Maryland, ORDERED, that the judgments hereinbefore entered by the Circuit Court of Baltimore City be, and they are hereby, reversed, and it is further, ORDERED, that the causes be remanded to the Circuit Court of Baltimore City with instructions to the Chancellor to issue forthwith permanent injunctions restraining the appellees from seizing motion picture projectors belonging to the appellants if the appellants surrender films allegedly being shown in violation of Maryland Code Article 66A, upon demand, after legal arrest or the production of a valid search and seizure warrant.

The reasons for this per curiam order to be stated in an opinion to be filed at a later date. Costs to be paid by appellees. The Mandate shall issue forthwith."

We now explain why we issued the above-quoted per curiam order.

On October 31, 1978, Europo Books, Inc.,[1] trading as

---

1. There are other appellants and other appellees as a result of several cases having been consolidated for trial in the circuit court. We also consolidated the cases for purposes of this appeal because they involve the same issue.

Sweden Book Store, filed in the Circuit Court of Baltimore County a petition for an *ex parte* injunction to restrain Donald D. Pomerleau, Commissioner of the Baltimore City Police Department and four named individuals who were members of the police department's Vice Squad, from seizing motion picture film projectors that were used to display a film that had not been licensed by the Maryland State Board of Censors. Md. Ann. Code art. 66A § 2. The same day a temporary injunction was issued which directed the defendants "not to seize any film projectors during the execution of any search and seizure warrants at the premises of Sweden Book Store. . . ." The injunction, by its own terms was to expire on November 8, 1978.[2]

After a hearing, the issuing judge terminated the temporary injunctions, sustained the defendants' preliminary objections [3] and dismissed the petition. An immediate appeal was taken to this Court. We advanced the case and heard oral argument on November 24, 1978. The same day we issued the per curiam order reversing the circuit court.

Europo and others [4] are engaged in the business of selling, distributing and exhibiting books, magazines and motion picture films. At the core of the instant appeal is the alleged practice of the appellants of showing in their so-called "Peep Shows" motion picture film that has not been licensed by the State.[5] Any question as to whether the film shown at "Peep Shows" is within the ambit of the Board of Motion Picture Censors was resolved in *Sanza v. Maryland State Board of Censors,* 245 Md. 319, 226 A. 2d 317 (1967), and underscored in *Marques v. State,* 267 Md. 542, 298 A. 2d 408 (1973), the latter stating "that the films used for the 'peep shows' " are subject to the review mandated by Md. Ann. Code art. 66A. *See also Star v. Preller,* 375 F. Supp. 1093 (D. Md.) *aff'd,* 419

---

2. An equity court has the power to restrain police authorities from unwarranted and illegal interference with the property rights of an individual. Gaither v. Cate, 156 Md. 254, 257, 144 A. 239, 240 (1929).

3. We are unable to find within the records of Europo Books, Ellwest Stereo Theatres, or Fayette News Center, Inc., any motion raising preliminary objection.

4. *See* n. 1.

5. All motion picture films are required to be "duly approved and licensed by the" Maryland Board of Censors. Md. Ann. Code art. 66A § 2.

U. S. 956, 95 S. Ct. 217, 42 L.Ed.2d 173 (1974). Appellants do not attack the constitutionality of Article 66A, nor do they challenge the seizure of the unlicensed film. They do, however, vigorously oppose the practice of seizing the projectors into which the unlicensed film is fed for the purpose of viewing.

We are informed that on successive days in the month of October 1978, vice squad officers entered the business establishments of each of the appellants, and after inserting the necessary sum of money into a coin operated device [6] supposedly to observe whether the film bore the seal of approval by the Censor Board,[7] titles of the films were noted and subsequently compared with the records of the Censor Board in order to ascertain whether these particular films had been licensed. Following the comparison, which apparently revealed the film had not been licensed, search and seizure warrants were obtained in the Circuit Court of Baltimore and in the District Court, First District.

According to the appellants, and not disputed by the appellees, the warrants authorized the "seizure of two specifically named movies and 'other movies offered for viewing not having previously been submitted to the ... Board.' " Notwithstanding the language of the warrant, "200 projectors were seized from premises owned and operated by the" appellants. On oral argument the State conceded that the question of whether the Censor's seal has been affixed to the film can be ascertained by merely looking at the film, without its having to be shown on screen by a projector. Police officers testified that the "seizure of the projectors was necessitated by their lack of training in operating motion picture projectors and their fear that they would damage the films if they attempted to remove them." The projectors appear to be

---

6. The coin receptacle or "slot" is not part of the projector. As best we understand it, the insertion of the coin causes an electrical impulse that turns on the projector which then operates for an interval of time. A number of coins must be inserted before the entire film may be viewed.

7. The only basis for disapproving a film is on the ground that it is obscene. Sanza v. Maryland Bd. of Censors, 245 Md. at 339, 226 A. 2d at 328. There is nothing in the record to indicate that the films were ever submitted to the Board.

standard 8 mm and 16 mm projectors similar in kind to those used in individual homes for the purpose of showing so-called "home movies." There has been a modification to the projectors that were seized in the instant case which allows the projector to be cassette loaded, and which should make removal of the film easier.

Appellants suggest that "difficulty" in removing the film is but "eyewash" to cover the economic sanctions that the police are inflicting upon the appellants. We observe that prior to the seizures in the instant case, the projectors were not seized by the police, but that film was removed from the projector by an employee of the business concerned, and it was then turned over to the police.

The theory advanced by the State for the seizure of the projectors is that they are "evidence of the crime" of showing unlicensed motion picture film. Why the film, itself, coupled with the testimony of the officer that it had been exhibited, would not suffice is unexplained. Neither is there an explanation as to how the projector adds to the State's proof or in any manner strengthens the State's case.

We believe the State had no more right to seize the projector because the film was unlicensed than it would to seize a motor vehicle because the driver was unlicensed, or to seize the printing presses because the newspaper contains patently obscene matter.

It is important to bear in mind that we are here dealing not with a question of obscenity, but solely with a licensing statute. Confiscation of personal property has not been sanctioned by the Legislature as an acceptable punishment for violating such a licensing statute. The tactics used in the case now before us, if judicially approved, could lead to other seizures in other licensing cases. For example:

1) The unlicensed plumber could have his tools seized as evidence that he performed plumbing work without a license.

2) A person practicing law without having been licensed could have his law library seized as evidence.

3) Much the same could be said of the person practicing medicine without having been authorized to do so.

One can imagine the hue and cry if depositors' money in an unlicensed bank was seized as evidence that the bank was doing business while unlicensed.

The appellees, however, aver that they are perfectly willing to return the properties as soon as the criminal proceeding has terminated. That ordinarily means following acquittal or, if there be a conviction, when the time for appeal to a higher tribunal has expired without the noting of an appeal. Perhaps overlooked or ignored in the appellees' willingness to return the projectors is the chilling effect the offer has on the right of appeal. It is very much a "damned if you do and damned if you don't" proposition. The appellant is forced either to pay the penalty meted in the first instance or pay what could prove to be a larger penalty taking the form of an economic setback occasioned by the loss of the equipment during the appellate process. The end result is that the appellant is placed in a no-win position.

A case similar to that before us was decided by the Court of Appeals, Second District, Division 4 of California. That Court, in *Porno, Inc. v. Municipal Court, Los Angeles Judicial District,* 33 Cal. App. 3d 122, 108 Cal. Rptr. 797 (1973), upheld the judgment of the Superior Court of Los Angeles County which had overturned the municipal court and directed that motion picture projectors which had been seized pursuant to search warrants be returned to Porno.

The appellate court observed that "[t]he reels of film were not permanently attached to the machines. Any standard 16 millimeter film could be inserted or removed from these projectors in a matter of seconds." 33 Cal. App. 3d at 124, 108 Cal. Rptr. at 799. They went on to note that:

"It is theoretically possible that in a prosecution . . . the prosecutor might offer in evidence a film projector as corroboration of the officer's testimony that he saw the offending films projected on a screen. But while possible, it seems most unlikely

that such an exhibit would be offered, and appellants have made no contention in the superior court or here that the projectors were seized for that purpose.

. . .

Although the projectors may have been used in the commission of a misdemeanor, they were designed for and capable of use for lawful purposes. The alleged guilt of the owner had not been judicially determined." 33 Cal. App. 3d 125-26, 108 Cal. Rptr. at 799-800.

The State, in the case *sub judice,* did argue in the circuit court and here that the projectors would be used as evidence. We think it clear that such an assertion was carefully designed and advanced in order to avoid being successfully accused of overreaching. Notwithstanding the State's contention, it is crystalline that its aim was not to offer hundreds of projectors into evidence but to strike at the appellants' pocketbooks and, thus, make it unprofitable for "peep shows" to continue to exhibit unlicensed film. One difficulty with that attempted solution is that, as in *Porno,* the cassettes are not permanently attached to the projectors and the projectors may be used for the purpose of showing licensed films.

What has actually occurred in the instant case is that the appellees are imposing a form of punishment upon the appellants that has not been authorized by the Legislature. The seizure of the projectors not only precludes the displaying of unlicensed film, but also prevents the lawful use of the projector as a means of expression that is protected by the First Amendment to the Constitution of the United States and by Article 40 of the Constitution of Maryland, Declaration of Rights. *Porno, Inc. v. Municipal Court, Los Angeles Judicial District,* 33 Cal. App. 3d at 126, 108 Cal. Rptr. at 800. *See also United States v. Polak,* 312 F. Supp. 112 (1970); *Bongiovanni v. Hogan,* 309 F. Supp. 1364 (1970); *Interstate*

*Circuit, Inc. v. Dallas,* 247 F. Supp. 906 (1965). The Supreme Court has said:

> "[A] State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible conse-quences for constitutionally protected speech." *Marcus v. Search Warrants,* 367 U. S. 717, 731, 81A S. Ct. 1708, 1716, 6 L.Ed.2d 1127, 1136 (1961).

Certainly no less restriction is imposed upon the State when it deals with mere unlicensing, a subject not as offensive as obscenity.

We hold that the seizure of the projectors was unlawful and unconstitutional. It was in sum unreasonable and amounted to a taking of property without due process of law. Thus, the seizure violated the First and Fifth Amendments of the federal constitution and Articles 23 and 40 of the Maryland Constitution, Declaration of Rights.

In so holding, we are not without understanding of the discomfiture that the appellees encounter in their day-to-day efforts to enforce licensing statutes, as well as those directed against obscenity, but paraphrasing Judge Thompson, speaking for this Court in *Meyer v. McDonnell,* 41 Md. App. 13, 392 A. 2d 1129 (1978), the solution does not lie in the pollution of the stream of justice. No justification exists for the employment by law enforcement officers of an unlawful act to counter the illegal deed of the lawbreaker. That the appellants may have broken the law does not permit police to depart from their licit purpose and emulate the offenders.

Under our system of criminal justice, it is the function of law enforcement officers, a division of the executive branch of government, to detect crime, ferret out the wrongdoer, and to charge him, her, or it with a particular offense or offenses. The matter of punishment is specified by the Legislature but imposed by the judiciary.

We deem it advisable to comment upon the motion raising preliminary objection as filed by the State [8] and granted by

---

8. As we indicated in n. 3, *supra,* no such motion appears to have been filed in *Europo, Fayette News,* or *Ellwest Stereo Theatres.* Nevertheless, the

the trial court. The motion asserted that the circuit court should "decline jurisdiction over the subject matter ... due to the pendency of several criminal trials before the District Court of Maryland where the same issues can be raised and decided." The motion was apparently grounded on Md. Rule 323 a 6. That rule permits the filing of such a motion if there is a "Pendency of another action between the same parties for the same cause."

The District Court is not empowered to issue injunctions. Consequently, even though there may have been criminal charges pending before that court against the appellants, the injunctive relief sought by appellants was not within the power of the District Court to grant, even had it been so inclined.

The trial judge did not set forth any reason for the granting of the motion raising prelininary objection, so that we are left to guess as to why that action was taken. If the reason was because of Rule 323 a 6, it was incorrect and the motion should have been denied. In any event, it was patently not applicable to three of the cases.[9]

order of the circuit court granted the motion with respect to all cases now before us.

9. *See* n. 3 and n. 8, *supra.*