Al STAR, as manager and operator of Gayety Books, Inc. and Fayette News Center, Inc., Petitioner,

v.

David PRELLER et al., Defendants.

Civ. No. 72-27-Y.

United States District Court,
D. Maryland.

Oct. 3, 1972.

Burton W. Sandler and William E. Seekford, Towson, Md., for petitioner.

Francis B. Burch, Norman Polovoy, Thomas G. Young, Baltimore, Md., for defendants.

Before SOBELOFF, Senior Circuit Judge, and YOUNG and BLAIR, District Judges.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, District Judge.

Plaintiff, seeking both injunctive [1] and declaratory [2] relief, challenges the constitutionality of the Maryland motion picture censorship statute, Article 66A, §§ 1–26, Annotated Code of Maryland, on its face and as applied to him. For reasons to follow, we find no merit in plaintiff's contentions and thereby deny his claim for relief. The essential facts have been stipulated by the parties.

Plaintiff, Al Star, at all material times, was an owner having a financial interest in Gayety Books, Inc. and Fayette News Center, Inc., and was engaged in the commercial dissemination of adult material, specifically motion picture film in coin-operated machines shown privately to individuals in booths intended for a single viewer, the machines being activated by the deposit of coins therein. The customer is at liberty to terminate the viewing at any time.

Defendants, David Preller, Margery Shriver and Mary Avara, are members of the Maryland State Board of Censors; defendant, Donald Pomerleau, is the Commissioner of the Baltimore City Police Department (BCPD); defendant, Colonel Maurice duBois, is the Chief of

---

1. Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

2. Pursuant to 28 U.S.C. § 2201.

the Criminal Investigation Division, BCPD; defendant, Detective Sgt. Michael Gray, is a member of that division; defendants, Marvin Mandel and Francis Burch, are Governor and Attorney General, respectively, for the State of Maryland.

Jurisdiction is claimed and exists under 28 U.S.C. § 1343(3). Since a substantial constitutional question is herein involved, a three-judge court was convened pursuant to 28 U.S.C. § 2281 et seq.

On September 10, 1971, November 30, 1971, and January 6, 1972, pursuant to duly executed warrants authorizing the search of and seizure from plaintiff's premises of materials being exhibited in violation of Article 66A, twenty-four (24) reels of film were seized by Baltimore City Police officers during raids on the Gayety[3] and Fayette[4] stores because of plaintiff's failure to submit these films to the Maryland State Board of Censors for licensing as required by Article 66A and because none of the films bore a Censor Board seal as provided in Article 66A. No member of the Censor Board was present at the time of the three raids or at the issuance of the warrants prior to the raids. As a result of these raids, the two stores were closed for approximately one hour during each of the raids, and the coin-operated film machines remained closed for an additional period of time following the raids until plaintiff obtained more film. The films seized remain in the custody of the BCPD or the Supreme Bench of Baltimore City. There are no state criminal prosecutions pending against plaintiff as a consequence of the raids and his failure to submit the seized films for licensing.[5]

Plaintiff has unleashed a legal broadside against Maryland's Motion Picture Censorship statute by alleging that numerous statutory provisions[6] and enforcement practices violate his First Amendment freedom of speech as protected by the Fourteenth Amendment. While this Court will attempt to answer all of plaintiff's contentions, the primary issue presented for our determination is whether the amendments to Section 19 of Article 66A enacted by the Maryland Legislature in April, 1965, after the Supreme Court's decision in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), meet the constitutional requirements for film censorship statute set forth in *Freedman*.

## I.

As a threshhold matter, we must consider plaintiff's standing to challenge the various statutory provisions he condemns. In *Freedman, supra,* the Supreme Court, in denying the State's contention that appellant had standing to attack only that section of the Act he had violated, stated at page 56, 85 S.Ct. at page 737:

"In the area of freedom of expression it is well established that one has

---

3. Gayety Books was the scene of the first and third raids.

4. Fayette News Center was the scene of the second raid.

5. Frank Harrington, nominal president and treasurer of Fayette News until December 6, 1971, and a director and president of Gayety Books, was arrested as a result of the three raids and was convicted and fined for violating the censorship law under charges stemming from the first raid, and has criminal charges pending against him as a consequence of the last two raids. Since, however, Harrington is not a party to this case and plaintiff Star has no state prosecutions pending against him as a result of the raids, this Court's decision does not improperly intrude into the State's criminal proceedings stemming from the raids and we need not dismiss the complaint. *See* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

6. Plaintiff challenges sections 1, 2, 3, 6, 7, 11, 14, 15, 16, 17, 18, 19, 21 and 23. He does not attack sections 4, 5, 8, 9, 10, 12, 13, 20, 22, 24, 25 or 26, which are primarily housekeeping provisions.

standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license. 'One who might have had a license for the asking may . . . call into question the whole scheme of licensing when he is prosecuted for failure to produce it.' "

■ This Court's reading of *Freedman* gives plaintiff standing to contest those sections of the Maryland statute which lead up to and result in a license being initially granted or denied and which set forth the Board's enforcement power.[7] However, plaintiff does not have standing to challenge those provisions which are in no way involved in the present controversy and whose resolution would require us to engage in speculation on matters too contingent for judicial determination. This includes those portions of § 7 dealing with the replacement of "lost, mutilated or destroyed" seals and the revocation of previously awarded seals; § 15, concerning obscene, indecent advertisements;[8] and § 21, which sets forth penalties for "misbranded" films, films bearing false seals, and the exhibition of obscene advertising matter. We do not wish to foreclose arguments by future litigants on matters not squarely before us.

## II.

■ In Sanza v. Maryland State Board of Censors, 245 Md. 319, 226 A.2d 317 (1966), the Court of Appeals of Maryland construed the term "film" used in § 1 of Article 66A to include films shown in coin-operated machines to individuals in a booth, often referred to as "peep shows." Such films must, therefore, be submitted to the Censor

Board for licensing prior to being exhibited to the public commercially for profit. Article 66A, § 2, Annotated Code of Maryland. While plaintiff argues that the question of submission of films for examination or censorship prior to their public exhibition has not been decided by the Supreme Court, we are satisfied that the Court has indeed sanctioned such state provisions as not void on their face in violation of the First and Fourteenth Amendments in Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961).

■ Plaintiff contends that the seizure of his films prior to an adversary hearing on the question of obscenity was unconstitutional under the authority of A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Tyrone, Inc. v. Wilkinson, 410 F.2d 639 (4th Cir. 1969); and Adler v. Pomerleau, 313 F. Supp. 277 (D.Md.1970). The cases relied on by plaintiff, however, dealt with the seizure of allegedly obscene materials prior to an adversary hearing. In this case we need not consider the issue of obscenity since the films were seized, not for their allegedly obscene content, but because they had not been submitted for approval to the Board of Censors and did not bear the required seal. Thus each film constituted a distinct violation of Maryland's motion picture censorship statute and was seized for that reason rather than for violating the State obscenity law, Article 27, § 417, Annotated Code of Maryland. The Supreme Court in *Times Film* and *Freedman* made clear the fact that a state may require an exhibitor to submit a film for examination or censorship prior to its public viewing, which plaintiff failed to do. Article 66A does not, on

---

7. This includes sections 1, 2, 3, 6, those portions of section 7 describing the license and its appearance on the screen, sections 11, 14, 16, 17, 18, 19 and 23.

8. There is no allegation by defendants that plaintiff displays obscene advertising.

The seizures were made because of plaintiff's failure to submit the films for approval and because none of the reels contained a Censor Board certificate, not because of any improper advertising by plaintiff.

its face or as applied here, constitute an "end run" around the preseizure adversary hearing requirement established in the cases relied on by plaintiff because films are seized, not for their alleged obscenity, but because, in this case, they have not been submitted for examination by the Board and do not bear the required seal. Plaintiff's claim that he is denied equal protection of the law because films and not literature must be submitted to the Board of Censors for approval is similarly without merit. No materials protected by the First and Fourteenth Amendments, including films, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), may be seized for their allegedly obscene content prior to an adversary hearing on the question of obscenity. Tyrone, Inc. v. Wilkinson. However, the Supreme Court in *Joseph Burstyn*, at 503, 72 S.Ct. 777, and in *Times Film*, 365 U.S. at 49, 81 S.Ct. at 395, recognized that for censorship purposes motion pictures are not "necessarily subject to the precise rules governing any other particular method of expression." Thus, it is not unconstitutional for Maryland to create a Board of Censors for films but not for other means of expression.

In Freedman v. Maryland, *supra,* the Court held the Article 66A, § 2 requirement of prior submission of films to the Board to be an invalid previous restraint because the Maryland statutory scheme, particularly § 19, did not contain adequate "procedural safeguards designed to obviate the dangers of a censorship system." Id. 380 U.S. at 58, 85 S.Ct. at 739. As a guide to the Maryland legislature, the Court set forth the following procedural requirements:

"First, the burden of proving that the film is unprotected expression must rest on the censor. . . . Second, while the State may require advance submission of all films, in order to proceed effectively to bar all showings of unprotected films, the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression. The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint. . . . To this end, the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film. Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution. Moreover, we are well aware that, even after expiration of a temporary restraint, an administrative refusal to license, signifying the censor's view that the film is unprotected, may have a discouraging effect on the exhibitor. . . . Therefore, the procedure must also assure a prompt final judicial decision to minimize the deterrent effect of an interim and possibly erroneous denial of a license." (Citations omitted) 380 U.S. at 58–59, 85 S.Ct. at 739.

The Supreme Court having set out the framework for a valid censorship system, the Maryland legislature thereafter enacted a bill, which became the new § 19 of Article 66A, to correct the deficiencies found by the Court in *Freedman.*

The present § 19 [9] provides that any film submitted to the Board of Censors for examination and licensing must be

---

9. § 19. Review and approval or disapproval of film by Board; judicial determination; appeal; sale, exhibition, etc., of film without approval and license.

(a) Any film duly submitted to the Board for examination and licensing shall be reviewed and approved within five (5) days, unless the Board shall

reviewed within five days. If the Board determines the film to be obscene,[10] and refuses to issue a license, then the Board must within three days after the expiration of the five day period apply to the Circuit Court for Baltimore City for an independent judicial determination of obscenity. The Circuit Court must conduct a hearing and view the film within five days after the Board has filed its application. Within two days after the hearing, the Circuit Court must enter a decree and order either approving or disapproving the Board's decision. If the Circuit Court sustains the Board's ruling, then the person presenting the film for licensing may appeal that decision to the Court of Special Appeals of Maryland, which must "advance such case on its calendar to the earliest practicable date," and view the film in question. Throughout this judicial procedure, the burden of proving that the film is obscene rests with the Board. The penalty provision of § 19 provides that one who sells, leases, lends, exhibits or uses any film without having submitted it to the Board for approval and licensing is guilty of a misdemeanor and upon conviction before a Magistrate or the Municipal Court of Baltimore City may be fined from $50 to $100, or imprisoned up to thirty days, or both. Finally, § 19 carves out a statutory exemption for employees of motion picture exhibitors, provided the employees are not

disapprove such film under the provisions of § 6 hereof, in which event the Board shall, within not later than three (3) days thereafter, apply to the Circuit Court for Baltimore City for a judicial determination as to whether such film is obscene, or tends to debase or corrupt morals, or incite to crime, within the meaning of § 6 hereof. Notice of such application shall be forthwith sent by first-class mail, postage prepaid, to the address of the person presenting such film for licensing. The Circuit Court for Baltimore City shall, within five (5) days after the filing of said application, conduct a hearing, and shall in connection therewith view such film; within (2) days after such hearing said court shall enter its decree and order requiring that said film be approved and licensed or be disapproved if in violation of the provisions of said § 6 hereof. If the decree and order disapproves said film as being in violation of the provisions of § 6 hereof, then the person presenting such film for licensing may appeal such determination to the Court of Special Appeals of Maryland, in accordance with the Maryland Rules of Procedure, and said Court shall advance such case on its hearing calendar to the earliest practicable date; and, in reviewing the order appealed from, said Court shall view the subject film. The burden of proving that the film should not be approved and licensed shall rest on the Board.

(b) Any person who shall sell, lease, lend, exhibit or use any film in this State without having first secured approval thereof and a license therefor in accordance with the procedures set forth

in subsection (a) above, shall be guilty of a misdemeanor and upon conviction summarily before a magistrate or the Municipal Court of Baltimore City, shall be sentenced to pay a fine of not less than fifty ($50.00) dollars, nor more than one hundred ($100.00) dollars, or to imprisonment for not more than thirty (30) days, or to be both fined and imprisoned in the discretion of the magistrate or judge. Except, no employee or any individual, partnership, firm, association, corporation, or other legal entity operating a theater which shows motion pictures, shall be subject to prosecution under this section if the employee is not an officer thereof and has no financial interest therein other than receiving salary and wages.

10. Maryland has incorporated into § 6(b) of Article 66A the three-pronged test for determining obscenity as set forth in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1967) and elaborated in subsequent cases. Sanza v Maryland State Board of Censors, 245 Md. 319, 326–327, 226 A.2d 317 (1966). In Dunn v. Maryland State Board of Censors, *supra* at 338, 226 A.2d 317 the Court of Appeals of Maryland struck down as unconstitutional the standards tending "to debase or corrupt morals" and "incite to crime" respectively contained in § 6(c) and (d) of Article 66A, and held that obscenity was the only valid standard for disapproving a film. This moots plaintiff's contention, *infra*, that the terms "tends to debase or corrupt morals, or incite to crime" as found in § 6(c) and (d) are unconstitutionally vague.

officers of the entity operating the place of exhibition and have no financial interest, other than receiving salary and wages, in such entity.

Plaintiff attacks the constitutionality of the present § 19 in several respects, claiming that the censorship procedure set forth is unduly protracted and allows the imposition of penalties for the interim exhibition of a film which has not been licensed even though the film may ultimately be adjudged not obscene; that he is denied a trial by jury on the question of obscenity because the Circuit Court of Baltimore City is a court of equity; that § 19(b) of the statute imposes criminal sanctions for failure to apply for and obtain a license prior to the exhibition of a film, permits no defense to a criminal prosecution for failure to obtain a license other than that the film was submitted and a license obtained, and includes no element of scienter; that the statute denies him an adversary hearing before the Board of Censors; that the Board need not give its reasons for denying a license; that it is inconvenient to require all persons to come to Baltimore City to contest the issue of obscenity; that the language "tends to debase or corrupt morals, or incite to crime" found in § 19(a) is vague; that the term "sell, lease, lend, exhibit or use" (particularly "use") found in § 19(b) is also vague; and that the statutory exemption for employees of motion picture theatre operators denies him equal protection of the law.

■ Considering each of plaintiff's contentions seriatum we conclude that the Supreme Court in Freedman v. Maryland, *supra*, approved the interim restraint of the showing of a film prior to a final judicial determination on the question of obscenity, as long as such restraint is not protracted. As stated by the Court at page 59 of 380 U.S., at page 739 of 85 S.Ct.

"Any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution."

Though plaintiff has not done so in this case, should any exhibitor show an unlicensed film during the pendency of review proceedings provided in § 19, he would, of course, subject himself to criminal sanctions, just as plaintiff has done by not initially submitting his films for approval and licensing. We detect no unconstitutionality in this possibility nor in the sanctions imposed, particularly since the exhibitor will have knowingly submitted his film for approval and will, under § 19(a) receive notice of the Board's application to the Circuit Court for Baltimore City for a judicial determination of obscenity.

■ The procedure set forth in § 19 of Article 66A fully complies with the guidelines enunciated by the Court in *Freedman* by providing for a prompt judicial determination of obscenity. This is exemplified by Trans-Lux v. Maryland State Board of Censors, 240 Md. 98, 213 A.2d 235 (1965), decided subsequent to the amendments to Article 66A designed to meet the requirements set forth in *Freedman*, in which the total length of time between initial submission of the film to the Board and final judicial appellate review was 71 days, which includes a delay of 10 days caused by the applicant in appealing the decision of the Circuit Court for Baltimore City.[11]

11. In United States v. Thirty-seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), the Court, to avoid passing upon the constitutionality of 19 U.S.C. § 1305(a), judicially imposed time limits upon the procedures by which customs officials may prohibit the importation of obscene materials into the United States, on the ground that since a federal statute was involved, the Court had jurisdiction to authoritatively construe it. To harmonize the statute with constitutional requirements, the Court imposed a 14-day limitation from the time the goods are seized to the institution of judicial proceedings for their forfeiture and a 60-day limitation from the filing of the action to final decision in the district

We hold that such expeditious proceedings fully meet the constitutional standards set out in *Freedman*.

■ Plaintiff's contention that he is denied a jury trial on the question of obscenity because the Circuit Court of Baltimore City, the trial court, is a court of equity is without merit. The Supreme Court in Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957), approved the constitutionality of a procedure under § 22–a of the New York Code of Criminal Procedure whereby a state court sitting in equity was empowered to enjoin the sale and distribution of written and printed matter found after due trial to be obscene. Though we deal here with films rather than literature, we detect no constitutional infirmity in the Maryland procedure for determining obscenity by a court sitting in equity as long as essential procedural safeguards in terms of notice and fair hearing are provided. In fact, the Supreme Court in *Freedman* cited with approval New York's equitable injunctive procedure upheld in *Kingsley Books*. Nor is plaintiff denied his right to a jury trial in a criminal misdemeanor proceeding under § 19(b) of Article 66A, since the penalty involved—a possible $100 fine or 30 days in jail, or both—indicates that the offense is of a petty nature, and thus a jury trial is not constitutionally mandated. Duncan v. Louisiana, 391 U.S. 145, 159–162, 194, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966).

■ The fact that Maryland has chosen to attach criminal sanctions to the failure to apply for and obtain a license prior to exhibition of a film in 19(b) provides no basis for striking down that portion of the statute. As stated by the Supreme Court in Kingsley Books, Inc. v. Brown, *supra*, 354 U.S. at 441, 77 S.Ct. at 1328:

> "It is not for this Court thus to limit the State in resorting to various weapons in the armory of the law. Whether proscribed conduct is to be visited by a criminal prosecution or by a *qui tam* action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice."

Moreover, plaintiff has demonstrated that he is not limited in the defenses he may present in a misdemeanor prosecution under § 19(b), such as a lack of scienter in committing the alleged offense. In fact, the Supreme Court in Smith v. California, 361 U.S. 147, 80 S. Ct. 215, 4 L.Ed.2d 205 (1959), held that in a First Amendment context the state cannot eliminate the element of scienter and impose strict liability in a criminal prosecution. Thus, while we have been unable to find a reported Maryland decision on this issue, it is clear that defendant would be able to raise the defense of a lack of scienter in a criminal prosecution under § 19(b), and that the State would have to prove this element in order to sustain a conviction.[12]

■ Though § 19(a) does not provide plaintiff with an adversary hearing

court, a total of 74 days. The Court carved out exceptions to this time schedule for delays caused by the claimant or for delays pending the consideration of constitutional issues appropriate only for a three-judge court. The Court made clear the fact that it was not deciding what time limits are constitutionally permissible in other contexts, such as the state censorship of obscene films involved in *Freedman*. However, it does furnish a guideline as to time limitations in the area of obscenity, and, as illustrated in Trans-Lux v. Md. State Board of Censors, *supra*, Maryland's censorship procedure

is capable of complete judicial determination, *including appellate review*, in 71 days, including delays by the applicant. Moreover the Maryland statute goes a step beyond the procedure set forth in *37 Photos.*, *supra*, by requiring the Court of Special Appeals of Md. to advance obscenity determinations on its hearing calendar "to the earliest practicable date," thereby providing for expeditious appellate review.

12. This would also apply to one who is prosecuted under § 17 for making a false statement to the Board in his application for approval of a film or view.

before the Board of Censors on the issue of obscenity, he is not constitutionally prejudiced in this regard because that section does require, in accordance with *Freedman,* an adversary judicial determination of obscenity with the Circuit Court for Baltimore City exercising *de novo* review of the Board's finding of obscenity, and with the burden of proving that the film is unprotected expression resting on the Board. Since plaintiff has a right to an adversary judicial determination of obscenity which the Board cannot avoid under the mandatory language of § 19(a) unless it initially approves a film for exhibition, he will be fully apprised of the Board's reasons for denying him a license, particularly in light of the fact that the burden of proving a film's obscenity rests on the Board, not upon the exhibitor.

Plaintiff's claim that the statute imposes an unconstitutional burden upon applicants for licenses by requiring them to come to Baltimore, Maryland, to appear before the Circuit Court to contest the issue of obscenity is highly frivolous inasmuch as the business operations involved here are located in Baltimore resulting in no inconvenience whatsoever to the plaintiff. This is illustrated by the fact that the State of Maryland constitutes one district in the federal judiciary. 28 U.S.C. § 100.

We have already disposed of plaintiff's contention that the term "tends to debase or corrupt morals, or incite to crime," found in § 19(a) with reference to § 6(c) and (d), is vague.[13] Again, we find this assertion to be moot due to the authoritative construction of Article 66A by the Court of Appeals of Maryland in Dunn v. Maryland State Board of Censors, *supra,* and Sanza v. Maryland State Board of Censors, *supra.* Similarly, authoritative judicial construction by the highest court of the State of Maryland of the term "sell, lease, lend, exhibit or use" found in §

19(b) has confined that language to films "shown commercially for profit"[14] removing any suspicion of unconstitutional vagueness as to the term in question.

Finally, plaintiff is not denied equal protection of the law by the provision in § 19(b) exempting employees of motion picture theatre operators from prosecution under § 19. The mere creation by statute of a classification does not constitute a denial of equal protection under the Fourteenth Amendment. Here, it was perfectly reasonable for the legislature to exempt mere salaried employees from prosecution, since they have no control over films shown by their employer.

We conclude that the amendments to Article 66A, § 19, passed by the Maryland legislature in April of 1965 to correct the deficiencies found by the Supreme Court in *Freedman,* satisfactorily bring that section in harmony with constitutional requirements and constitute a valid exercise of the state's police powers. Times Film Corp. v. City of Chicago, *supra.*

### III.

We will now consider the remaining multitude of plaintiff's contentions. To facilitate an orderly determination of the issues raised, we shall first respond to plaintiff's general assertions and then to his particular attacks against various sections of Article 66A.

Plaintiff, by claiming that his films are shown to individuals in the "privacy" of a booth by means of coin-operated machines activated by the individual viewers, seeks to place his peep show operation under the rubric of Stanley v. Georgia, 394 U.S. 557, 89 S. Ct. 1243, 22 L.Ed.2d 542 (1969). The facts of this case, however, are a far cry from those presented by *Stanley,* which dealt with private possession of obscene materials in the home. Here, plaintiff

---

13. *See* note 10, *supra.*

14. Sanza v. Maryland State Board of Censors, *supra,* 245 Md. at 339–341, 226 A.2d 317.

is engaged in the commercial distribution of films to the public for his own profit, which the Supreme Court in its most recent decisions has held may be restricted by statutes which are drawn to assure adequate procedural safeguards of constitutional rights. United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), and United States v. Thirty-Seven Photographs, *supra*. The size of the audience at each particular showing is not a relevant consideration in the context of this case in determining whether plaintiff's privacy has been unduly circumscribed.

 Plaintiff claims that the Baltimore City Police Department does not have jurisdiction to enforce Article 66A either by seizing films or otherwise preventing their exhibition, citing in support of his contention sections 14 and 16 of the Act, which give the Board power to enter premises exhibiting films commercially for profit and to enforce Article 66A. The enactment of that article was not intended to overrule other sections of the Code which provide for the creation of police forces with authority to enforce laws within the boundaries of the relevant geographical entity. Article 23B, § 22 and Article 20, § 6, Annotated Code of Maryland.[15] By the Act of 1869, Chapter 367, the legislature took the BCPD out of the City's control and put it under the authority of the State. Adams v. Baltimore Transit Co., 203 Md. 295, 311, 100 A.2d 781 (1953). We need not determine whether the BCPD is capable of enforcing laws beyond the City's limits, since in the case at bar it is clear that the BCPD seized the films in question at establishments located within Baltimore City itself and, therefore, was acting within the scope of its authority. To conclude otherwise would inevitably result in the highly untenable and undesirable rule that a police force is unable to enforce a criminal sanction within its jurisdiction. More-over, the Board of Censors, contrary to plaintiff's assertion, did not have to delegate its authority to enforce Article 66A to the BCPD since the latter agency is perfectly competent to enforce state laws within its bailiwick.

 Plaintiff has attempted to demonstrate bad faith enforcement of Article 66A, claiming that the BCPD confiscated massive quantities of film during the three raids; that his establishments were closed during the raids and the machines were inoperable until additional films were obtained; and that he has been threatened with future seizures and arrests. The evidence presented to this Court does not support such assertions. The parties stipulated that 24 reels of film were seized from the coin-operated machines by City police officials during the raids, none of which had been submitted to the Board for approval or bore the Board's seal as required by Article 66A. Thus each film seized constituted a distinct and obvious violation of Article 66A. There is no indication of excessive police conduct during any of the three raids. The State has, in good faith, prosecuted the individual, Frank Harrington, it believed responsible for the statutory violations.[16] Nor is there any evidence that if plaintiff complies with the provisions of Article 66A he will meet with future police enforcement against himself, his employees or his establishments.

 Plaintiff charges that the police had no probable cause to obtain the search warrants which were obtained prior to each raid. However, an affidavit submitted by defendant, David J. Preller, Chairman of the Maryland State Board of Censors, demonstrates that the Board, aware of the difficulties it was having in enforcing Article 66A against certain establishments in Baltimore City, such as plaintiff's, met with various state officials, including the Commissioner of the BCPD, informing them

---

15. Though Article 20, § 6 was repealed effective July 5, 1971, we are referred to it by extant Article 23B, § 22 to de-termine the scope of power of police forces generally.

16. *See* note 5, *supra*.

of the situation and requesting that they exercise their respective jurisdictions to obtain compliance with Article 66A. Armed with such information, as well as information obtained from an investigation of the situation from the Attorney General's office and from subsequent meetings, the BCPD conducted the raids in question. Plaintiff has offered no evidence to contradict the affidavit, and we find sufficient probable cause for the police to have obtained the search warrants for raids of plaintiff's premises.

We now move to a consideration of plaintiff's allegations against specific statutory provisions.

■■ Plaintiff claims that the definition of "film" contained in § 1 is overly broad, so as to include films which are not exhibited commercially to the public for profit and which are shown on television. The Court of Appeals of Maryland, however, in Sanza v. Maryland State Board of Censors, supra, construed the terms "film" and "view" used in § 1 to implicitly include only those films and views shown commercially for profit. This brings Article 66A into constitutional conformity with the rationale of Stanley v. Georgia, supra, regarding unnecessary intrusions by the state into an individual's privacy. Plaintiff has not demonstrated, and we are unable to determine, whether Article 66A has been applied to the showing of films on television. Absent affirmative evidence in this regard, we need not rule on plaintiff's novel contention inasmuch as federal courts should not initially construe state statutes. Reetz v. Bonzanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970).

■ As he did in his attack upon § 19(b), plaintiff challenges the term "use" or "used" found in §§ 2, 6(a) and 17 as being unconstitutionally vague and broad. Again, the Court of Appeals of Maryland in Sanza confined such language solely to films or views shown commercially to the public for profit, a construction which removes any doubt of constitutional infirmity.

■ Plaintiff next directs his fire at § 3, claiming that it does not provide adequate guidelines for determining qualifications to serve on the Board, and, alternatively, that the present members are unqualified to serve and have disregarded their own experts' opinions in determining whether or not a film is obscene. Section 3 provides that the Governor, with the advice of the Secretary of Licensing and Regulation and with the advice and consent of the Senate, appoint "three residents and citizens of the State of Maryland, well qualified by education and experience to act as censors under this article." We agree with the opinion of the Court of Appeals of Maryland in Sanza that the requirement that administrative discretion "be circumscribed by reasonably definite standards . . . goes to the delegation of power to the agency by the legislative body; it does not go to the exercise of the executive power to appoint the members of the agency." Id. 245 Md. at 334–335, 226 A.2d at 325. This Court will not supervise the appointment or measure the qualifications of state officials. Even if we were to do so, we think the language of § 3 is sufficiently definite to furnish adequate standards for the selection of Board members and that these standards have been followed regarding the present members of the Board. Nor has plaintiff introduced evidence beyond a mere allegation that the Board has acted improperly in his case, probably because he has not applied to the Board for approval of his films.

■■ Sections 6(a) and 23 carve out statutory exemptions for newsreels and for noncommercial showings of films "for purely educational, charitable, fraternal or religious purposes, by any religious association, fraternal society, library, museum, public school, private school or institution of learning." Plaintiff claims that these exemptions are unconstitutionally vague and deny him equal protection of the law. We find no constitutional infirmity as to either exemption. Both are drawn with

sufficient precision to inform those who plan to exhibit films or views whether they qualify for the exemptions. In fact, the procedure set forth in § 23 for applying to the Board for an exemption under that section enables those exhibitors who are uncertain as to their exempt status to seek clarification. Moreover, the exemptions do not deny plaintiff equal protection of the law. Newsreels are, by their nature, exhibited primarily for their informative value rather than to entertain and would undoubtedly have redeeming social importance under the *Roth* test for obscenity. Given a finite amount of resources to regulate the exhibition of films, the legislature exercised reasonable judgment in exempting films such as newsreels, which in any case would be held to be protected speech under contemporary standards of obscenity. The exemption for films exhibited solely for "educational, charitable, fraternal, or religious purposes" is also a reasonable, valid classification which gives recognition to the dangers inherent in an extensive censorship system, particularly in light of the Supreme Court's decision in Stanley v. Georgia, *supra*; see Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

■ Section 11 of Article 66A requires advance payment to the Board of a fee of $3.00 for every 1,000 feet of original film, or fractional part thereof, examined where the film averages 16 frames or less to the foot, and a fee of $4.00 for every 1,000 feet of film, or fractional part thereof, examined where the film averages more than 16 frames per foot.[17] Plaintiff contends that this license fee places an unconstitutional burden on the exercise of his First Amendment freedom of expression. Though the power to impose a license fee on the exercise of free speech is highly potent, we do not find that the fees imposed by § 11 are unreasonable,

but rather are necessary to meet the expenses incident to administering Article 66A. Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The question to be decided in each case is whether the control sought to be enforced is of such magnitude as to constitute an unwarranted abridgement of the freedom of speech. Cox v. New Hampshire, *supra*, at 574, 61 S.Ct. 762. In this case, the purpose of the fee is not to suppress protected rights but to meet the expenses of administering the statute. The flexibility of the fees charged according to the length of the film or view is a fair recognition of the fact that a longer film or view will take up a greater amount of the Board's examination time than a shorter one and constitutes no ground for striking down that portion of the Act. Additionally, there is no evidence that plaintiff or any other exhibitor has been financially unable to afford the fee or that the provision is administered in other than a fair and impartial manner.

■ Plaintiff argues that sections 14, 16 and 18 are too vague and broad to withstand constitutional scrutiny. Section 14 provides any member or employee of the Board a right of entry into any place where films are being exhibited and empowers him to prevent the exhibition of those films which have not been duly approved by the Board. Section 16 grants to the Board power to enforce Article 66A and to adopt reasonable rules to carry out this mandate. Section 18 prohibits "any person" from interfering with any member or employee of the Board seeking to enforce the Act. Again, as with plaintiff's prior claims of vagueness and overbreadth, we find that the sections in question are set forth with sufficient precision to protect those who are subject to the provisions of the Act, particularly in light of authoritative judicial

---

17. Section 11 also requires advance payment to the Board of a fee of $2.00 for each original set of 100 views or fractional part thereof and an advance fee of $1.00 for replacing a seal which has been lost, mutilated or destroyed in accordance with the provisions of § 7 of Article 66A.

**544**

construction by the Court of Appeals of Maryland in *Sanza*, which restricts enforcement of Article 66A to films shown commercially for profit. Thus, a member or employee of the Board may enter a commercial establishment which permits the public to view films or views for a price to prevent the display of an unapproved film, but not a church, school or other exempt premises which are not exhibiting films commercially for profit. That no person should interfere with a state official attempting to carry out state law is a common concept which, in the context of this case, admits of no constitutional imprecision. Nor has plaintiff introduced probative evidence demonstrating that members of the Board, its employees or officers of the BCPD have arbitrarily or impartially enforced against him Article 66A, its right of entry provision, or any other provision.

Finally, plaintiff contends that he is denied Due Process of Law by that provision of § 17 which voids *ab initio* any license issued upon a false or misleading affidavit or application. We find no merit to this claim, for, as stated previously, this sanction does not come into play in a First Amendment context unless the State has shown that the falsification was done with knowledge and not accidentally or innocently. Smith v. California, *supra*. Moreover, we are once again placed in the position of deciding an issue in a vacuum since plaintiff stipulates that he did not even submit an application to the Board for approval of the films in this case.

We hold that for the reasons set forth in this opinion Maryland's motion picture censorship statute, Article 66A, meets the constitutional requirements enumerated in Freedman v. Maryland, *supra*, and in other decisions of the Supreme Court cited herein, both on its face and as applied to the plaintiff in this case. Plaintiff's request for declaratory and injunctive relief is hereby denied.

It is so decreed and ordered.